UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-22780-CIV-SEITZ

MAGISTRATE JUDGE McALILEY

PAUL ORAVEC,

        Plaintiff,

vs.

SUNNY ISLES LUXURY VENTURES L.C.,
THE SIEGER SUAREZ ARCHITECTURAL
PARTNERSHIP INC., CHARLES M. SIEGER,
JOSE J. SUAREZ, DEZER PROPERTIES LLC,
DEZER DEVELOPMENT, LLC, MICHAEL DEZER,
GIL DEZER, THE TRUMP CORPORATION,
DONALD J. TRUMP, RESIDENCES AT OCEAN
GRANDE, INC., AND ROYAL DEVELOPMENT
HOLDINGS, LLC,

        Defendants.

_____/

NIGHT BOX FILED

APR 10 2006

CLARENCE MADDOX
CLERK US DIST. CT. S.D. FLA. MIA

## SIEGER SUAREZ DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants, The Sieger Suarez
Architectural Partnership, Inc. ("Sieger Suarez"), Charles Sieger, and Jose Suarez (collectively,
the "Sieger Suarez Defendants"), move for summary judgment on Count I (Copyright
Infringement by Sunny Isles, Sieger Suarez, Sieger, Suarez and Dezer Properties) of Plaintiff's
Second Amended Complaint. The Statement of Material Facts and supporting Appendix, filed
concurrently herewith, and the following Memorandum of Law support this Motion.

167/06

## MEMORANDUM OF LAW

> [T]his action as a whole has been built up, partly upon a wholly erroneous
> understanding of the extent of copyright protection; and partly upon that
> obsessive conviction, so frequent among authors and composers, that all
> similarities between their works and any other which appear later must inevitably
> be ascribed to plagiarism.

*Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945). This obsessive conviction,

recognized 60 years ago, is now shared by Paul Oravec, who asserts that Trump Palace and

Trump Royale (currently under construction in Sunny Isles Beach, Florida) infringe his putative

copyright interest in a series of rudimentary models and building "designs" that he currently

claims he drew, sculpted, or assembled sometime in the mid- to late-1990's.

## I.   INTRODUCTION

### A.   Sieger Suarez & The Trump Ocean Grande Project

With more than 30 years of experience, Sieger Suarez is a premier architectural firm

specializing in luxury high-rise residential design and development. (SOF ¶ 1.) Its buildings dot

the skyline in southern Florida. (SOF ¶ 1.) In the late 1990's, Colonial Ridge Development,

LLC ("Colonial Ridge") hired Sieger Suarez to design the buildings for a parcel of land located

at approximately 18001 Collins Avenue in Sunny Isles Beach, Florida. (SOF ¶ 3.) Sieger

Suarez originally designed a two-building solution, with a round condominium hotel and Y-

shaped residential condominium. (SOF ¶ 4.) After the Dezers (who, through one of their

entities, were members in Colonial Ridge) acquired additional ocean front property adjacent to

the original site, the project was modified and enlarged to take advantage of this extra acreage

(and, hence, increased density allowances). (SOF ¶ 5.) As the Developers acquired yet more

land, the project expanded again – this time with the addition of another residential

condominium (SOF ¶ 6.).

2

The current version of the project thus consists of three planned buildings:  Trump International Sonesta Beach Resort (the "Hotel"); Trump Palace; and Trump Royale.  (SOF ¶ 8.) This lawsuit alleges only that Trump Palace and Trump Royale infringe Oravec's copyrights. The Hotel is not at issue here.

**B.      Oravec And His Putative Copyrights**

Oravec is not a licensed architect anywhere in the United States and has never designed any highrise building that has been constructed here or elsewhere in the world.  (SOF ¶¶ 13-14.) But that has not stopped him from illegally practicing architecture by attempting to sell his rudimentary building design to several south Florida developers in 1996 through 1998.  (SOF ¶ ¶ 12, 49, 65-66.)  This lawsuit is premised upon these illicit activities, as well as Oravec's prior and subsequent copyright registrations (which he later abandoned).

On or about July 1, 1996, Oravec registered, as "[a]rchitectural drawings and model," a photograph of a model and other drawings that depict his "Reverse Horse Shoe Building."  (SOF ¶¶ 16-17.)  Less than a year later, on May 2, 1997, Oravec submitted a second application for copyright registration, seeking protection for his alleged "architectural work."  (SOF ¶ 18.)   The 1997 Registration included photographs and drawings that Oravec has testified encompass his "design" for the "Reverse Horse Shoe Building - Twin Towers."  (SOF ¶¶ 18-19.)  And in November 2002, Oravec submitted yet an additional application for "New Word Trade Center Towers," registering it as an architectural work.  (SOF ¶¶ 20-21.)

As is readily apparent from comparison of these copyright applications, Oravec had continued to work with the same basic configuration of shapes, simply adding an exterior "swiss-cheese" design element to the 2002 application.  Other than that, the vertical cores remained round, flat on top, and centrally located.  (SOF ¶¶ 17, 19, 21.)  At all times, both sides of the

building had a convex, concave nature, with at least five such alternative convex/concave segments. (SOF ¶¶ 17, 19, 21, 124.)

But suddenly, in Oravec's March 2004 application – more than a full **year** after he admits he viewed, photographed, and studied the Trump Palace and Trump Royale sales models and brochures – Oravec registered the model that appears from one side to have some similar exterior features only to the Collins Avenue face of Trump Palace and Trump Royale. (SOF ¶¶ 24-27, 32.) Oravec initially attempted to register these photographs, models, and other drawings as an Architectural Work. (SOF ¶ 29.) He claimed that he had finished creation of the work in 1996 and that his deposit "material includes all previous designs and versions and depict[s] them in 3-D models/photographs, renderings/43 pages." (SOF ¶ 29.)

The Copyright Office, however, rejected this application, returning it to Oravec. (SOF ¶ 30.) Oravec resubmitted his application and registered his various models, photographs, and drawings as "3-dimensional sculpture," "2-dimensional artwork," and "photographic works." (SOF ¶ 31.) The materials deposited with the Copyright Office through Oravec's March 2004 application are not therefore registered as architectural works. (SOF ¶¶ 31-32.) This material is protected **only** as pictorial, graphic, and sculptural ("PGS") works, not an architectural work.

Moreover, under oath, Oravec averred to the Copyright Office that he completed the creation of this work in 2001. (SOF ¶¶ 31-32.) Importantly, Oravec now contends in this lawsuit, however, that he actually completed the creation of the materials included in his March 2004 at various times in 1997, 1998, and 2003 or 2004. (SOF ¶¶ 33-34.) Astonishingly, Oravec admits that he created a model of Trump Palace or Trump Royale after visiting the Trump Grande Project sales center and registered it, as part of the March 2004 copyright registration, as his own work. (SOF ¶ 34.)

Despite all the evidence (except Oravec's newly-concocted deposition testimony and interrogatory responses) indicating that Oravec did not prepare the materials submitted with his March 2004 copyright registration until after Sieger Suarez completed its design and after Oravec visited the sales center of Trump Palace and Trump Royale, Oravec maintains this suit seeking to recover over $120 million. Even assuming that Oravec truthfully testified in his deposition and interrogatory responses (and therefore lied on his March 2004 application for copyright registration), he cannot prevail, as a matter of law, in this case for myriad reasons, including:

(1)    Oravec's 1996, 1997, 2002, and April 2004 designs fail to meet the requisite standards for protection as Architectural Works (*see*, *supra*, at 7-13, 15-18);

(2)    Oravec did not register or make any architectural drawings or plans that underlie the models (and, in particular, model "5177" depicted in the body of his Second Amended Complaint) in his March 2004 registration. Accordingly, as no drawings or plans exist, he obviously cannot establish that Sieger Suarez copied such plans in making their own architectural construction documents    precluding Oravec's ability to prove infringement of his PGS works (*see*, *supra*, at 13-18);

(3)    Oravec cannot establish that Defendants had access to any of his designs – especially drawing "5177" depicted in the body of his Complaint (*see*, *supra*, at 18-25);

(4)    There exists no substantial similarity between any of the materials Oravec registered with the Copyright Office in 1996, 1997, 2002, March 2004 and April 2004 and Trump Palace or Trump Royale (*see*, *supra*, at 25-32);

(5)    Sieger Suarez independently created the designs for Trump Palace and Trump Royale (*see*, *supra*, at 32-36);

(6)    Oravec waived his claims of copyright protection for his building "design" (*see*, *supra*, at 37-38);

(7)    Oravec is barred from now profiting from his illegal attempts to market his "architectural" design (*see*, *supra*, at 38-40);

(8)     Jose Suarez and Charles Sieger have no personal liability and/or damage exposure here (*see, supra*, at 40-41); and

(9)     The doctrine of laches bars Oravec's claims (*see, supra*, at 41).

## II.     ARGUMENT

### A.     Summary Judgment Standard In Action For Copyright Infringement

"Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994); *see also, e.g. Fed. R. Civ. P.* 56(c).  While evidence must be viewed in a light most favorable to the nonmoving party, this "does not mean that [the Court is] constrained to accept all the nonmovant's factual characterizations and legal arguments." *Beal*, 20 F.3d at 458.  And "the mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1247 (11th Cir. 1999) (quotation marks and citation omitted).

In short, non-infringement in a copyright action may be appropriately "determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Id.*; *Beal*, 20 F.3d at 458 ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted.").  Because there is no genuine issue of material fact to support the necessary elements of Plaintiff's claim of copyright infringement, summary judgment is appropriate here.

### B.   Oravec Cannot Establish Copyright Infringement

Plaintiff must prove two elements to establish a *prima facie* case of copyright infringement: (1) ownership of a valid copyright; and (2) that Defendants copied "constituent elements of the copyrighted work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1232 (11th Cir. 2002). "If the plaintiff does not have direct proof of copying, the plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are 'substantially similar.'" *Herzog*, 193 F.3d at 1248; *accord Benson v. Coca-Cola Co.*, 795 F.2d 973, 974 (11th Cir. 1986). "Proof of access and similarity is not enough, however, to affirmatively establish infringement. These elements only raise a presumption of infringement which may be rebutted by proof of [defendant's] independent creation of the allegedly infringing [work]." *Benson*, 795 F.2d at 974; *Calhoun*, 298 F.3d at 1232.

In this case, Oravec cannot meet this threshold burden. And even if he could, the uncontested facts establish that Sieger Suarez independently created the design and plans for Trump Palace and Trump Royale.

### 1.   Differing Standards and Protections Apply to Works Registered Under § 102(a)(8)

For over two centuries, the United States did not protect constructed buildings under its copyright law. *See Leicester v. Warner Bros.*, 232 F.3d 1212, 1216 (9th Cir. 2000). While technical drawings and plans were eventually deemed copyrightable subject matter, buildings that were built according to those plans were not. This was a deliberate choice, based in part on the belief that buildings are primarily functional, and the copyright laws do not extend to utilitarian works. *Leicester*, 232 F.3d at 1216-17. It was also informed by the widespread conviction that architecture is, by its nature, derivative, and that progress in architecture includes

- and indeed requires   modifications to and improvements on prior works.  *Architectural*

*Design Protection: Hearing on H.R. 3990 and H.R. 3991 Before the Subcomm. on Courts,*

*Intellectual Property, and the Administration of Justice of the House Comm. on the Judiciary,*

101st Cong., 101-102 (1990).

Accordingly, under Section 102(a)(5) of the Copyright Act (the sole method of protecting

an architectural design or plan prior to 1990), copyright protection did not extend to the

realization of the design in an actual building.  As a consequence, the copyright owner of

architectural plans could prevent unauthorized reproduction *of the plans themselves*, but could

not prevent the construction of a building form those plans.  *See, e.g., Demetriades*, 680 F. Supp.

at 664.  Only in those cases where the second designer copied the original drawings and

specifications -- that is, copied the plans themselves   was there a basis for liability.  *See Robert*

*R. Jones Assocs. V. Nino Homes*, 858 F.2d 274, 280 (6th Cir. 1988); *Demetriades*, 680 F. Supp.

at 664.

But in 1988, the United States became a signatory to the Berne Convention for the

Protection of Literary and Artistic Work (the "Berne Convention").  *H.R. Rep.* 101-735.  "Article

2(1) of the Berne Convention requires member countries to provide copyright for 'works of

architecture'   the constructed design of buildings."  *Id.*  To ensure that the United States was in

compliance with the Berne Convention, Congress enacted the Architectural Works Copyright

Protection Act ("AWPCA") in 1990.  The AWPCA added a new category, "architectural works,"

to the list of protected works of authorship.  17 U.S.C. § 102(a).

Thus, architectural works do not constitute a subset of PGS Works, but rather a stand-

alone category.  The sole purpose of the AWPCA was to place the United States squarely in

compliance with the Berne Convention and protect buildings that had already been constructed. *Id.*; *Subcommittee Hearing*, at 191.

An author may therefore seek protection for architectural plans under either or both of two separate subsections under 17 U.S.C. 102(a). Section 102(a)(5) provides protection for architectural plans and drawings as a pictorial, graphic, and sculptural work ("PGS Work"). Section 102(a)(8) provides protection for "architectural works." The scope and type of an author's rights in a work differ depending upon whether the he or she sought protection under Section 102(a)(8) as an architectural work or under Section 102(a)(5) as a PGS Work. While an author may seek protection under both categories, he or she must submit separate registrations. *See* 37 C.F.R. § 202.11(c)(4); *Attia v. Society of the New York Hospital*, 201 F.2d 50, 52 n.3 (2d Cir. 1999).

Here, Oravec registered the materials that he submitted with his 1996, 1997, 2002, and April 2004 for protection solely as architectural works under Section 102(a)(8). And he registered the materials submitted with his March 2004 application for protection solely under 102(a)(5) as a PGS Work. The differing protections afforded to Architectural Works and PGS Works is therefore critical to this action, and this Motion deals with each in turn.

a. **Oravec's Registration of "Architectural Works" – 1996, 1997, 2002, and April 2004**

Section 102(a)(8) of the Copyright Act protects an "architectural work," which, again, is defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101. Thus, the question becomes: What constitutes "the design of a building?" In light of the original goal and history of the AWCPA to limit protection to constructed buildings, it follows that the "design of building" as embodied in plans must mean a design from which a building *could be* constructed

9

or at least plans and drawings that are particularized and substantially complete. This conclusion is reinforced by the absence in both AWCPA and its legislative history of any indication that conceptual drawings, preliminary studies, partial designs, or incomplete designs are intended to fall within this definition. *See* 17 USC § 101, 102(a)(8); *H.R. Rep.* 101-735.

Moreover, the few courts to confront this issue have held that, to receive protection under the AWCPA, a "design of a building" expressed in an architectural drawing, model or plan must exceed a mere generalized or rudimentary depiction of a building. *See, Attia v. Society of the New York Hospital*, 201 F.3d 50 (2d Cir. 1999); *Sparacar v. Lawler, Matuksy, Skelly, Engineers, LLP*, 303 F. 3d 460 (2d Cir. 2002). Oravec's 1996, 1997, 2002, and April 2004 copyrights fail to meet this requisite standard for protection even through the most lenient enunciated standards.

For example, in *Attia*, 201 F.3d at 50-55, the plaintiff alleged that the defendant stole his copyrighted schematics, drawings, and sketches depicting a plan for the renovation of the New York Hospital ("Hospital"). Plaintiff and defendant had worked for several months on plaintiff's idea together. But eventually, the hospital terminated plaintiff and opened the renovation process to bid. The Hospital chose defendant to complete the renovations. After plaintiff saw the proposal several years later, he sued.

The Second Circuit held that plaintiff did not have a valid copyright interest in his sketches and drawings because the "similarities do not go beyond the concept and ideas contained in Plaintiff's drawings." *Attia*, 201 F.3d at 55. The court recognized:

> [T]he drawings in [Plaintiff's] booklets are highly preliminary and generalized; they describe Plaintiff's proposed design at a very general level of abstraction. Defendants' schematic  drawings, in contrast, which [Defendants] prepared over several years of work on the Hospital's commission, constitute a detailed expression of how to effectuate the Major Modernization Program by constructing over the F.D.R. Drive and restructuring existing buildings.

*Id.* at 55.  Distinguishing these circumstances from prior copyright cases involving architecture, the court reasoned:

> The preliminary, conceptual nature of Plaintiff's drawings distinguishes them from the drawings at issue in each of the three precedents he cites in support of his copyright infringement claims.  In each of these cases, architects sued for copyright infringement and prevailed; in each, however, the misappropriated architectural plans, unlike Plaintiff's, consisted of drawings that were sufficiently detailed to enable construction.

*Id.* at 56.  While the court in *Atalia* did not go so far as to say that only constructed buildings may receive protection or even only that construction plans may receive protection under the AWCPA, it emphasized that a Plaintiff cannot protect rudimentary expression of a generalized idea for a "building design." *Id.* at 55-56.  Detailed expression of how to actually effectuate construction of a building is a must for an architect's work.  *Id.*

Similarly, the Second Circuit, in *Sparaco*, 303 F.3d at 460-68, addressed a claim of copyright infringement regarding a site plan registered as an architectural work.  The Second Circuit reversed the district court's determination that the site plan deserved no protection because it found the district court in interpreting the "constructability" test alluded to in *Atalia* to a site plan.  It held that the "site plan specifies more than vague, general indications of shape and placement of the elements.  It provides detailed specifications for preparation of the site." *Id.* at 468.

Indeed, it noted that the City's direction of Building, Planning, and Zoning testified that the site plan at issue "was a very detailed plan . . . upon which the shown project could have been built in conformity with all of . . . Ramapo's codes and regulations."  Thus, while the Court instructed that it did not mean to create a bright-line constructability rule, it emphasized that the materials registered as architectural works must be sufficiently more detailed than rudimentary and generalized drawings and depictions of a building shape and configuration.  *Id.* at 468.

11

Again, the Court required a plan that included detailed specifications for the side that would comply with applicable codes and regulations. *Id.; see also Shine v. Childs*, 382 F. Supp. 2d 602 (S.D.N.Y. 2005) (noting that generalized concepts regarding the placement of elements or engineering strategies are not worthy of protection, but finding that scale model, elevation sketches, photomontage, floor plans, renderings, structural design, site plan, and sections presented into evidence were sufficiently detailed to receive protection as architectural work).[1]

In each of these cases, plaintiff had submitted detailed scale models, architectural drawings, site plans, elevations, renderings, sections, and so forth.  Here, Oravec has none of these.  Even a cursory glance at Oravec's 1996, 1997, 2002, and April 2004 registrations show a paucity of any detail beyond a generalized expression of a concept for a high-rise building design with convex/concave elements.  For example, in his 1996 registration, Oravec merely registered two pieces of paper   one showing a generalized, not-to-scale model of a single building with two vertical cores and the other consisting of rudimentary sketches of various "views".  There are no floor plans, site plans, detailed drawings, or even indications of structural support.  As a matter of law, Oravec's 1996 copyright registration simply does not warrant protection as an architectural work.

Similarly, Oravec's 2002 and April 2004 copyright registrations suffer from the same fatal deficiencies.  There, Oravec merely presents a picture.  There are no architectural details to take this out of the realm of fanciful artwork.  And despite the inclusion in his 1997 copyright registration of a generalized floor plan, there is no indication of dimensions, structural support,

---

[1] While Oravec's claims fail even under the standards enunciated in these New York cases, Defendants contend that they inappropriately held that the materials at issue constituted "architectural works" under the Copyright Act. These decisions strayed from the plain language, as well as purpose and intent, of the Copyright Act, as it was modified by the Architectural Works Copyright Protection Act in 1990.

or other requisite information sufficient to establish the detail necessary for protection under the AWPCA. Thus, as a matter of law, none of the materials registered by Oravec constitute an architectural work under Section 102(a)(8), and the Court should grant summary judgment in favor of Defendants regarding each of these registrations.

### b. Oravec's March 2004 Registration Under § 102(a)(5) Contained No Plans from Which Sieger Suarez Could Have Copied

Oravec registered his March 2004 models and drawings as "pictorial, graphic, and sculptural works" only. Authors who hold architectural plans copyrighted as PGS under section 102(a)(5) do not have unlimited exclusive rights, but are subject to the limitations set forth in section 113. 17 U.S.C. § 113. In particular, Section 113(b) provides a limitation on the derivative rights of the author when the copyrighted work "portrays, depicts, or represents an image of a useful article in such a way that the utilitarian nature of the article can be seen." *See id.* The text of section 113(b) provides:

> [The Copyright Act] does not afford, to the owner of copyright in a work that portrays a useful article as such, any greater or lesser rights with respect to the making, distribution, or display of the useful article so portrayed than those afforded to such works under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title.

17 U.S.C.A. § 113(b). Section 113(b) reflects the established principle that "copyright in a pictorial, graphic, or sculptural work, portraying a useful article as such, does not extend to the manufacture of the useful article itself." See Register's Report on the General Revision of the U.S. Copyright Law at 15 (Register of Copyrights July 10, 1961); *see also, e.g.,* Paul Goldstein, *Copyright* §7.4.4 (2d ed. Little, Brown 1996).

Courts apply this principle in the case of architectural plans, and it is well established that a copyrighted architectural drawing is not infringed by a building constructed from it. *See, e.g.,*

*Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 899 (5th Cir. 1972); *DeSilva Constr. Corp. v. Herrald*, 213 F. Supp. 184, 195-196 (M.D. Fla. 1962); 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.08[D][2][a] at 2-125 (2004 Rel.63, Apr. 2004) ("a building is not a 'copy' of the underlying plans, with the result that construction of the structure does not constitute infringement."). In short, a "person cannot, by copyrighting plans, prevent the building of a house similar to that taught by the copyrighted plans." *Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 280 (6th Cir. 1988).

Indeed, the Eleventh Circuit has long emphasized that a building cannot infringe upon copyrighted architectural plans. *See Imperial Homes Corp.*, 458 F.2d at 899. There, the Fifth Circuit (prior to its separation from the Eleventh) held that copyrighting architectural plans do not "clothe their author with the exclusive right to reproduce the dwelling pictured." *Id.* The court noted, in particular, that it did not hold "that the [defendants] were in anywise restricted by the existence of [plaintiff's] copyright from reproducing a substantially identical residential dwelling." *Id; see also DeSilva Construction Corp*, 213 F. Supp. at 195 ("[t]he protection extended by Congress to the proprietor of a copyright in architectural plans does not encompass the protection of the buildings or structures themselves, but it is limited only to the plans . . . appears to be unanimous view of respected text writers that, under the current copyright laws of the United States, the architect does not have the exclusive right to build structures embodied in his technical writings").

More recently, in *Donald Frederick Evans and Assoc., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 904 (11th Cir. 1986), the Eleventh Circuit again acknowledged that "construction of a substantially identical residential dwelling is not prohibited by the existence of a copyright in the architectural drawings for the original dwelling." It further held that a "builder who

14

constructs a home substantially similar to a dwelling already constructed is not liable for copyright infringement merely based on the substantial similarity if he or she did not engage in unauthorized copying or use of the copyrighted architectural drawings." *Id.* Thus, in the context of architectural plans or drawings registered as a PGS Work, courts have almost invariably found infringement only when literal copying or tracing is involved. *See* Goldstein § 2.15.1. In fact, in *National Medical Care, Inc. v. Espiritu*, 284 F. Supp. 2d 424, 435-36 (S.D.W.V 2003), the Court held that even when Defendants admitted to referencing protected, copyrighted drawings in preparing their own plans, copyright protection does not extend to as-built structures.

Thus, Oravec cannot prevail on his claim that Trump Palace and Trump Royale infringe his March 2004 copyright. It is undisputable that Sieger Suarez, in preparing their voluminous, detailed architectural construction documents, did not copy any plans from Oravec. Indeed, Oravec does not contend that Sieger Suarez copied his actual floor layouts or interior space configuration – or actually, anything other than the exterior, visual shape of one face of one side of one of his models. (SOF ¶ 129.) And with respect to the model "5177" depicted in the body of Oravec's Second Amended Complaint, Oravec admits he made no underlying floor plans or architectural drawings to create it. (SOF ¶ 34.) As it is impossible to copy something that does not exist, the Court should grant summary judgment as to Oravec's claims that Defendants infringed the materials he registered in March 2004.

### 2. Oravec's "Designs" Warrant No Protection Because They Merely Constitute Ideas and/or Concepts

"In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principal, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). Thus, "'copyright assures authors the right to their original expression, but

encourages others to build freely upon the ideas and information conveyed in the work.'" *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1264 (11th Cir. 2001) (quoting *Feist Publications*, 449 U.S. at 349-50). "Even original expression will be unprotected if it can be accurately characterized as an idea, procedure, process, or system." *See, e.g., Palmer v. Brown*, 287 F.3d 1325, 1330 (11th Cir. 2002).

Thus, courts routinely reject copyright claims based on the alleged copying of *scenes of fair* or common themes, plots, characters, and settings. *See, e.g., Suntrust Bank*, 268 F.3d at 1264; *Beal*, 20 F.3d at 459. Just as in manuscripts, architecture has various elements that are commonly used – and not only commonly employed, but functional. Thus, in making its determination regarding whether a copyright is valid or whether an alleged infringing copy of a work is substantially similar, the Court must first factor out any functional or commonly employed elements. *See, e.g., Palmer*, 287 F.3d at 1330; *Herzog*, 193 F. 3d at 1257; *Beal*, 20 F.3d at 460; *Trek Leasing, Inc.*, 66 Fed. Cl. 8, 12-14 (Fed Cir. 2005).

In this case, all that even arguably remains is Oravec's **idea** or **concept** for a building that would employ vertically stacked and staggered convex/concave elements that alternate as they progress up a building. But the utilization of convex/concave elements in building designs is hardly unique, and in many cases (such as with Trump Palace and Trump Royale) driven by function. (SOF ¶¶ 117-18.) Also, the cores housing the elevators and mechanical equipment are functional; the triangular braces are functional; the shape of the building is functional (to maximize Ocean views); its positioning on the site if functional (to comply with zoning, environmental, and coast-line codes); its height is functional (to comply with FAA requirements). (SOF ¶ 158.) None of these functional elements are unique to Oravec. In fact, Oravec candidly admits that he merely believes he has a monopoly on the use of the *idea* and

*concept* of a building with convex/concave sections that are stacked in the same vertical plane. (SOF ¶¶ 114-15.)  But the Copyright Act does not protect ideas or concepts.  And it does not protect functional aspects of a building design.

Moreover, in the context of a high-rise building, which necessarily needs elevator access and structural support from the ground to the roof (and beyond to house the elevator equipment), the ways Oravec could have expressed his stacked convex/concave sections in the same vertical plane are limited.  Elevators necessarily run vertically.  Because "there are so few ways of expressing [this] idea, the idea and its expression merge." *Palmer*, 287 F.3d at 1330.  "Under the so-called 'merger doctrine,' these few expressions do not receive copyright protection, since protection of the expressions would thus extend protection to the idea itself." *Palmer*, 287 F. 3d at 1330.

Thus, Oravec's expression necessarily merged with his idea for alternating convex/concave segments – and garners no protection under the copyright act. *Id.* This is especially true, as Oravec's plans are merely generalized depictions of this idea. *See, e.g., Trek Leasing*, 66 Fed. Cl. at 12-14 ("The hallmarks of a popular architectural style . . . are not protectable because of the definition of 'architectural work' ('does not include individual standard features'), and because of the application of two copyright maxims:  (1) the idea/expression dichotomy and its interplay with the merger doctrine, and (2) the concept of *scenes a faire*."); *Ale House Management, Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir. 2000) ("A casual comparison between [plaintiff's] various architectural floor plans and [defendant's] floor plans shows, at most, the imitation of an idea or a concept, but not the copying of the plans themselves. . . .  At this level of generality, [plaintiff's] design is nothing more than a concept, as distinct from an original form of expression and is not copyrightable.").

Accordingly, the Court should grant summary judgment in favor of the Sieger Suarez Defendants.

### C. Even Assuming Copyright Protection under 17 U.S.C. § 108(a)(5) or (8), Oravec Cannot Establish Copying

Even assuming that Oravec can somehow garner copyright protection for his "designs," he cannot establish that Sieger Suarez actually copied any of them.  Again, a plaintiff may establish copying either through direct or indirect proof.  *Herzog*, 193 F. 3d at 1249.  "If the plaintiff does not have direct proof of copying, the plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are 'substantially similar.'"  *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241 (11th Cir. 1999); *accord Benson v. Coca-Cola Co.*, 795 F.2d 973, 974 (11th Cir. 1986).

#### 1. Sieger Suarez Had No Access to Oravec's Materials

Recognizing that it is "often impossible for a plaintiff to offer direct evidence that defendant actually viewed or had knowledge of plaintiff's work," the Eleventh Circuit regards access as a "reasonable opportunity to view."  *Herzog*, 193 F.3d at 1249.  **But "[r]easonable opportunity does not encompass any bare possibility in the sense that anything is possible."**  Id. at 1250.  "Access may not be inferred through mere speculation or conjecture."  *Id.*; *see also, e.g., Ferguson*, 584 F.2d at 113.  Here, Oravec candidly admits that he is merely guessing or speculating as to how the Sieger Suarez Defendants may have gotten access to any of his materials.  (SOF ¶¶ 41-42.)

Oravec nevertheless posits the bare possibility that Sieger Suarez *might* have gained access through (1) Donald Trump; (2) the Portofino Group; (3) Bob Burstein; (4) Jose Milton;

(5) Luis D'Augustino; (6) Scott Roth; (7) Len Dugow; or (8) any of the approximately 120 companies worldwide to which Oravec testified he mailed various packages. (SOF ¶ 66.) But Oravec has no evidence that any of the Sieger Suarez Defendants subsequently had a reasonable opportunity to view these works. He can establish no evidence from which a reasonable person could infer that the Sieger Suarez Defendants had access to *any* of Oravec's materials – let alone, *which* materials they may have had access to and *when*.

The Eleventh Circuit has upheld the entry of summary judgment in favor of defendants in circumstances in which the evidence of the alleged access was greater than any to which Oravec can point. *See Herzog*, 193 F. 3d at 1244-57. In *Herzog*, the Eleventh Circuit affirmed summary judgment in favor of defendants because plaintiff's allegations concerning access were mere conjecture. There, Herzog wrote a screenplay, "Concealed," which she claimed John Sayles infringed in his work "Lone Star." *Id.* at 1244. In the fall of 1991, Herzog was a student in the Master of Fine Arts program at the University of Miami. *Id.* After one of her thesis committee members left the University, Herzog approached Cosford to ask if he would serve on the committee. *Id.* She provided him a copy of "Concealed," which he did not return after declining her invitation. *Id.*

Herzog next approached Stephen Bowles, who agreed to serve on the committee, and provided him a copy of "Concealed." *Id.* She also gave a copy to Scott Manders, a fellow student, for his review. *Id.* Finally, in April 1993, Herzog registered "Concealed." *Id.*

Like Oravec, Herzog did not allege that she ever submitted Concealed to Sayles or any other defendant. (SOF ¶¶ 40, 43, 112.) Instead, Herzog alleged that Sayles gained access to it through Cosford, Manders, or her thesis committee members, Bowles, Rothman, and Zorn. Herzog argued that while Sayles was in Miami in February 1993, he interacted with these

individuals, specifically Bowles, and thereby gained access to her screenplay. *Herzog*, 193 F.3d at 1244.

Sayles on the other hand, "stated that prior to the commencement of the lawsuit, he had never met or heard of Herzog or Manders; that he has never seen any screenplay entitled 'Concealed,' nor had he ever seen any work purporting to have been authored by Herzog." *Id.* at 1245. The court, noting that Plaintiff had produced nothing to refute Sayle's affidavit that he had never seen her work, granted summary judgment in favor of Sayles. The Eleventh Circuit affirmed, reasoning:

> Beyond having her evidence of delivery of "Concealed" to Mr. Cosford, Mr. Manders and the members of her committee, and Mr. Cosford's social acquaintance with Mr. Sayles credited, **Plaintiff is entitled to no presumption or assumption as to what happened to the materials after submission; that is something on which [she] must offer sufficient evidence under *Anderson* and *Celotex*.**

*Id.* at 1252 (emphasis added). As discussed in more depth below, Oravec can produce no evidence that any of the individuals or entities he named provided any of Oravec's designs to the Sieger Suarez Defendants. In fact, the various individuals deposed in this case emphasized that they had never met Oravec; had not seen any of his materials prior to this litigation; and therefore certainly never provided the Sieger Suarez Defendants access to the designs. (SOF ¶¶ 56, 59-60, 77-78, 87, 93.) Charles Sieger and Jose Suarez have further emphatically testified that, prior to this litigation, they had never seen any of Oravec's materials. (SOF ¶ 46-47) Oravec himself admits that he did not send his materials to Sieger Suarez and never met or spoke with Charles Sieger or Jose Suarez prior to filing this lawsuit. (SOF ¶¶ 40, 112.)

### a.   *Oravec's Illicit Marketing Efforts to South Florida Developers*

In or around May to June 1996, Oravec solicited the help of Tom Slingerland to market his putative building design to South Florida developers. (SOF ¶¶ 64-65.) Oravec and

Slingerland were colleagues at Creative Displays, a company that designs and manufactures signs for real estate sales centers and trade-show exhibits. (SOF ¶ 64.) Oravec needed Slingerland's assistance because of Slingerland's contacts with various South Florida developers. Slingerland used these contacts to introduce Oravec and his purported designs to certain individuals. (SOF ¶ 65.)

By March 1997, however, Oravec engaged the services of Neal Litman, a real estate attorney, to act as his broker of his alleged designs, and Slingerland ceased his assistance to Oravec. (SOF ¶¶ 49, 65.) On or about May 6, 1997, Neal Litman sent a package of Oravec's designs (although Litman does not know what the package contained) to Heinrich von Hanau and Jason Binn. (SOF ¶¶ 53-54.) When these efforts bore no fruit, Oravec conducted various mass mailings, cumulatively totaling approximately 120, in 1997 through 1999. (SOF ¶ 108.) Oravec did not, however, keep a record of who received what or when he sent the mystery packages. (SOF ¶ 109.)

### i.    Donald Trump

The trail of access through Donald Trump runs cold. While Litman testified that he delivered a package of Oravec's works (Deposition Ex. 22) to Donald Trump, Binn does not recall ever providing to Trump the materials that he received. (SOF ¶¶ 57-59.) Trump, in turn, testified that he has never seen any of Oravec's designs. (SOF ¶ 60.) Moreover, it is undisputed that at the time Trump became involved with the Trump Ocean Grande Project, Sieger Suarez had already designed the current configuration of Trump Palace. (SOF ¶ 61.) Thus, the alleged access through Donald Trump is a non-starter.

ii.      **Portofino Group**

Oravec and Slingerland met with various individuals from the Portofino Group, including Heinrich von Hanau, Margaret Nee, Bob Threat, and David Trautman, starting in 1996 and concluding in 1998. (SOF ¶ 67.) At the initial 1996 meeting, Oravec showed the designs and model that he had registered in 1996. (SOF ¶ 68.) The meeting supposedly took place in the Portofino model sales center. (SOF ¶ 67.)

A couple months later, according to Oravec, another meeting was held at the Portofino model sales center with the same individuals. (SOF ¶ 69.) Oravec again showed the Portofino representatives various designs and drawings. (SOF ¶ 69.) A third meeting was held two to three months after that at Portofino Group's Washington Avenue headquarters, (SOF ¶ 70), and a fourth meeting took place at the end of 1997, (SOF ¶ 71). As a result of this fourth meeting, Oravec developed the "fatter" version of a single footprint tower, which he never separately registered with the Copyright Office until March 2004. (SOF ¶ 72) The depictions of this "fatter" version include those contained in his March 2004 copyright registration, including the model ("5177") that is shown in the body of Oravec's Second Amended Complaint. (SOF ¶ 72.)

Finally, at the fifth meeting in early 1998, Oravec was simply told that Thomas Kramer, the principal of the Portofino Group, had sold the Ocean Parcel. (SOF ¶ 73.) Oravec did not make any presentation at that meeting and does not recall whether he left any additional materials with Portofino representatives at that time. (SOF ¶ 73.)

Heinrich von Hanau, David Trautman, and Robert Threat testified that they have never met Paul Oravec and had never seen any of the designs at issue in this litigation. (SOF ¶ 77.) And they did not provide these unseen designs to the Sieger Suarez Defendants. (SOF ¶ 90.)

Moreover, with respect to the design that Oravec contends is "most similar" to the Trump Palace and Trump Royale (that which is depicted in the body of Oravec's Second Amended Complaint), there is no evidence — even from Oravec — to support the inference that Oravec ever provided it to the Portofino Group.   Oravec acknowledges that he did not design it until **after** the fourth meeting, made no presentation at the fifth and final meeting, and does not recall whether he left any additional materials with the Portofino Group at that time.  (SOF ¶ 73.)

### iii.    Bob Burstein (L'Hermitage)

Contrary to Oravec's original testimony, he has since admitted that he never made a presentation to Bob Burstein.  (SOF ¶ 91.)  Instead, Slingerland simply left certain materials (Deposition Exhibit 100) with Burstein's receptionist one afternoon in 1996.  (SOF ¶ 92.) Burstein testified that he has never met Paul Oravec and has never seen his designs.  (SOF ¶ 93.) Burstein further testified that if he receives an unsolicited design, he throws it away.  (SOF ¶ 93.) Thus, there is no evidence from which a reasonable juror could determine that the Sieger Suarez Defendants had access to any of Oravec's designs through Bob Burstein, unless it was impermissibly inferred that Burstein actually received the designs and that Sieger went through his trash.

### iv.    Jose Milton

Slingerland dropped off certain of Oravec's designs (Deposition Exhibit 100) with Ms. Milton.  (SOF ¶ 95.)  There exists no evidence as to what Ms. Milton did with these designs. There is certainly no evidence that she provided them either directly or indirectly to the Sieger Suarez Defendants.  (SOF ¶ 97.)

### v.    Luis D'Augustino (ICG Group/Millennium Group)

In 1996, Ovarec made a presentation to Luis D'Augustino at his Brickell offices, and a second presentation a few months thereafter.  (SOF ¶ 98.)  Slingerland confirms that he and Oravec met with Luis D'Augustino in or about May 1996 – but testified that no other meetings occurred.  (SOF ¶ 98.)  The only materials shown to D'Augustino were the models created in 1996 and associated drawings.  (SOF ¶ 98.)  There is no evidence from which one could reasonably infer that Luis D'Augustino provided these materials to the Sieger Suarez Defendants.  (SOF ¶¶ 98-100.)

### vi.    Scott Roth (The Palms)

In mid- to late-summer 1996, Oravec and Slingerland met with Scott Roth to show him Oravec's design (Deposition Exhibit 100).  (SOF ¶ 101.)  Mr. Roth was not interested and returned the designs to Oravec upon conclusion of the meeting.  (SOF ¶ 102.)  Neither Sieger or Suarez has ever attended a meeting with Scott Roth in which Oravec's designs were shown or discussed.  (SOF ¶ 103.)  Thus, there is no evidence to suggest that Roth provided the design to Sieger Suarez.

### vii.    Len Dugow

Oravec has no evidence to establish that Len Dugow even ever received any of his materials, let alone passed them along to any agent or representative of Sieger Suarez.  (SOF ¶¶ 104-06.)  And it is uncontroverted that Len Dugow ever showed or discussed Oravec's "designs" with Sieger or Suarz.  (SOF ¶ 107.)

### b.    *The Mailings*

Oravec mailed approximately 120 differing packages over a three-year span (1997-99) to developers and architects world-wide.  (SOF ¶ 108.)  He did not mail any of his designs to the

Sieger Suarez Defendants or the Dezer Defendants.  (SOF ¶ 112.)  Deposition Exhibits 19 and 20 are the packages that Oravec claims he sent to these various individuals or entities.  (SOF ¶ 108.)  Oravec cannot say, however, which package went to what individual or entity – or even when he made a mailing to any particular person or entity.  (SOF ¶ 109.)  He has no evidence which, if any, of these companies received his package or what each did with it.  (SOF ¶ 109.)  Oravec further has no evidence from which a reasonable juror could infer that any of these individuals or companies provided any of Oravec's materials (let alone which materials) to Sieger Suarez.

In short, the alleged access through any of these channels is, as Oravec admits, total speculation and conjecture.  It is legally insufficient to establish the required reasonable opportunity for Sieger Suarez to view Plaintiff's supposed works.  And even if it did, the uncontradicted evidence establishes that only Oravec's designs that were registered in 1996 and 1997 were shown to the identified South Florida developers.  The Sieger Suarez Defendants are therefore entitled to summary judgment for Oravec's failure to establish access by Sieger Suarez to any of his designs (especially those contained in his March 2004 registration).  "Anything is possible" is simply insufficient to escape summary judgment.

### 2.    No Substantial Similarity Exists Between Any of Oravec's Works and Trump Palace or Trump Royale

Even assuming that the Sieger Suarez Defendants had access to Oravec's materials, there is no substantial similarity between any of Oravec's works and Trump Palace or Trump Royale.  "To establish substantial similarity, a plaintiff must satisfy a two-pronged test:  an extrinsic, or objective test and an intrinsic or subjective test."  *Herzog*, 193 F.3d at 1257.  "Under the extrinsic test, a court will inquire into whether, as an objective matter, the works are substantially similar in **protected expression**."  *Id.* (emphasis added).  As a part of this extrinsic test, the court must "determine whether plaintiff seeks to protect only uncopyrightable elements; if so, the court

25

will grant summary judgment to defendant." *Id.*; *see also, e.g., Beal*, 20 F.3d at 459.  Only if there are copyrightable and protected elements will the Court move on to the extrinsic test.

"Under the intrinsic test, a court will determine whether, upon proper instruction, a reasonable jury would find that the works are substantially similar." *Herzog*, 193 F.3d at 1257; *Beal*, 20 F.3d at 459.  "To show substantial similarity, the plaintiff must establish that 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work'." *Herzog*, 193 F.3d at 1248 (quoting *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982); *accord John Alden Homes, Inv. v. Kangas*, 142 F. Supp. 2d 1338, 1344 (M.D. Fla. 2001); *Lajoie v. Pavcon, Inc.*, 146 F. Supp. 2d 1240, 1247 (M.D. Fla. 2000); *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560, 1567 (M.D. Fla. 1995).

"An 'average lay observer' presumably is an individual who, without any vested interest in the governing issue, is sufficiently informed and alert to identify precisely the differences in the competing designs, yet sufficiently informed and independent to fairly identify and assess the similarities; that is, at a minimum, neither an engaged expert nor an oblivious passerby." *John Alden Homes*, 142 F. Supp. 2d at 1344 (internal quotation marks and citation omitted); *see also, e.g., Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560, 1567 (M.D. Fla. 1995). While the Court should examine the similarities to determine whether the "'total concept and feel' of the works and their 'aesthetic appeal' is the same," *Trek Leasing*, 66 Fed. Cl. at 18, the Court may also "assess the presence of differences between the two works" in evaluating substantial similarity, *id.*; *Lajoie*, 146 F. Supp. 2d at 1247.

This comparison of the works must be made between the works **as a whole**, but only as to the **protected elements**.  *See, e.g., Herzog*, 193 F. 3d at 1257; *John Alden Homes*, 142 F.

Supp. 2d at 1344; *Trek Leasing*, 66 Fed. Cl. at 12 ("Once the protectable aspects of the plaintiff's work are identified, they may be compared with the allegedly infringing work to determine copyright liability."). As the Federal Circuit recently explained in a claim involving the alleged infringement of an architectural work, "[t]his approach is very much like the abstraction-filtration-comparison test applied with regard to computer programs." *Id.* That is, "elements dictated by efficiency, necessity, or external factors must also be filtered out of the court's infringement analysis." *Id.* at 16. The Court may, therefore, "grant summary judgment for defendant as a matter of law if the similarity between the two works concerns only noncopyrightable elements of the plaintiff's work **or** if no reasonable jury would find that the two works are substantially similar." *Herzog*, 193 F.3d at 1257 (emphasis added); *accord Beal*, 20 F.3d at 459.

The elements of Oravec's materials that he contends Sieger Suarez misappropriated in designing Trump Palace and Trump Royale potentially include: (1) twin tower configuration; (2) convex and concave vertically stacked form; (3) three elevator shafts with slanted tops; (4) landscaped areas in exposed bottom floors; (5) combination of external bracing and exposed elevator shafts; (6) footprint; and (7) pool shape. (SOF ¶ 116.) As a result of these general alleged similarities, Oravec sued. But as Oravec directly and implicitly acknowledges, there can be no finding of substantial similarity between the Trump Palace and Trump Royale and any of his designs. (SOF ¶¶ 122, 124-27.)

### a. *Summary Judgment Is Appropriate Because Alleged Similarities Pertain Only to Noncopyrightable Elements*

Here, no reasonable juror could find that the plethora of Sieger Suarez's architectural drawings were appropriated from Oravec's registered materials. (*Compare* SOF ¶ 113 *with* SOF ¶¶ 16-21, 32.) With respect to the extrinsic test, each of the elements Oravec claims Sieger

Suarez infringed does not warrant protection under the Copyright Act.  External factors – the views, sizing issues, and zoning codes – dictated the shape (including the smooth, convex side facing the Ocean, and the convex/concave aspects of the side facing Collins Avenue) of Trump Palace and Trump Royale.  (SOF ¶ 118.)  Elevators are, of course, necessary in any high-rise building; their oval shape is hardly novel; the expressed tops are not unique to Oravec and are driven by the necessity of having an area above the roofline to house the necessary equipment; and the spacing of the elevators are is dictated by structural engineering and safety code concerns.  (SOF ¶ 118.)  The brackets are likewise common-place and necessary, functional elements to distribute the building's load.  (SOF ¶ 118.)

The idea of a "hole" in the middle of a building did not originate with Oravec, nor is it unique to include landscaping on the rooftops and terraces.  (SOF ¶ 119, 146.)  Indeed, Sieger Suarez put a similar spa level "hole" and further had landscaped rooftops and terraces in its earlier designed Portofino Tower.  (SOF ¶ 146.)  Finally, no "pool shape" is discernable on Oravec's materials – and he admits that he did not copyright any landscape architecture.  (SOF ¶ 119.)

Thus, each element that Oravec claims was infringed is not only *not* unique or original to Oravec, but each is function and/or dictated by extrinsic factors.  Accordingly, they are not protectable elements of expression under the extrinsic test.  The Court should therefore grant summary judgment in favor of defendants because the undisputed facts establish that the "similarity between the works concerns only noncopyrightable elements."  *Herzog*, 193 F.3d at 1257; *accord Beal*, 20 F.3d at 459.

b.   ***Even Assuming All Elements Copyrightable, No Substantial
Similarity Exists under the Intrinsic Test***

When the Court views the works in their entirety under the intrinsic test, no substantial similarity exists between any of Oravec's works and Trump Palace or Trump Royale. Even Oravec acknowledges that the "aesthetic appeal" between his registered works and Trump Palace and Trump Royale differ. (SOF ¶¶ 124-26.)

### i.   April 2004 Copyright Registration

Despite not having even created this design until after visiting the Trump Grande sales center in February 2003, (SOF ¶ 27), Oravec continues to maintain that the Sieger Suarez Defendants somehow infringed his April 2004 copyright registration. As even a perfunctory glance of Oravec's April 2004 materials and the plans of the Trump Palace or Trump Royale establish, there is no substantial similarity between the two. (SOF ¶¶ 35, 113.) The Court should therefore grant summary judgment on this issue.

### ii.   1996, 1997, 2002 Copyright Registration

Oravec acknowledges that the only similarities noted between the 1996, 1997, and 2002 deposit materials and Trump Place and Trump Royale include the composition of the vertically stacked convex/concave segments, three elevator shafts, and – with respect to the 1997 application only – external brackets. Each of these elements   including the shape – was dictated by external factors of function. (SOF ¶¶ 118, 153-55.) Because the Court must therefore first filter out all of these elements in comparing the works, none can be used to analyze whether Sieger Suarez's design from the Trump Palace and Trump Royale infringe Oravec's various copyrights. As nothing is left, there can be no infringement.

Even if, however, the Court compared the 1996, 1997 and 2002 copyright materials without first appropriately filtering out these elements, there still exists no substantial similarity

between Oravec's design and that of the Trump Palace and Trump Royale. The elevator cores are round and centrally located. There are five (as opposed to three) convex/concave segments, which are very slim, and alternate on both sides of the building. Thus, even those "similarities" do not make Oravec's 1996, 1997 and 2002 works substantially similar to Trump Palace and Trump Royale. No reasonable juror could find that these deposit materials and Trump Palace and Trump Royale are substantially similar.

In fact, Oravec acknowledges that the change from five segments to three segments produces different "aesthetic" results. (SOF ¶ 127.) He further acknowledges that centrally located elevator cores alter the shape and visual effect of the building. (SOF ¶ 122.) And that a building without alternating convex/concave segments on **both** sides of the building did not have the effect that Oravec was looking for in his designs. (SOF ¶ 126) Accordingly, even Oravec cannot really believe that the Trump Palace and Trump Royale are substantially similar to the designs submitted with his 1996 and 1997 copyright registrations. Summary judgment on this issue is therefore appropriate.

### iii.    March 2004 Registration

Oravec's March 2004 Copyright registration contains a hodge-podge of images, which, again, he protected solely as sculptures, artwork, and photographs under 17 U.S.C. § 101(a)(5). Contained within those images is "5177," which is depicted in Oravec's Second Amended Complaint, as well as a general outline of a floor shape. (SOF ¶ 32.) Even focusing on those images, which Oravec contends are the most similar of his designs to Trump Palace and Trump Royale, no substantial similarity can be found.

Again, each of the elements Oravec claims Sieger Suarez has infringed is functional or a feature dictated by external factors. (SOF ¶¶ 118, 153-55.) But even if the Court considered

them, there is no substantial similarity between even "5177" and Trump Palace or Trump Royale. Trump Palace and Trump Royale do not have alternating convex/concave stacked segments on both sides of the building. (SOF ¶ 125.) The buildings flare at the upper levels and have a differing slenderness ratio than Oravec's model. (SOF ¶ 147.) This produces an utterly different shape and configuration of Trump Palace and Trump Royale, as compared to even the most "similar" of Oravec's designs.

Indeed, for approximately three-fifths of the buildings (for example, floors 1 through 18 and 39 to 49 of the Trump Palace), Trump Palace and Trump Royale have no banana shape at all. That is because Oravec's designs have alternative convex/concave segments on both sides, three-fifths of Trump Palace and Trump Royale do not even have the same *shape*. (SOF ¶¶ 11, 113.) Having one side as smooth, clean, and fully convex further produces a different – and as Oravec admitted – utterly non-infringing view of the building as one looks in from the Atlantic Ocean. (SOF ¶¶ 124-26.) And, as Oravec also acknowledges, this failure to have both sides of the building with convex/concave features produces as different "effect" than that for which he was looking. (SOF ¶ 126.)

Moreover, Oravec had **no** floor plans for the units – any units of the "5177" model. (SOF ¶¶ 32, 34.) Sieger Suarez produced detailed and original floor plans depicting the exact spatial configuration of each unit and how each such unit would be integrated into the building as a whole. (SOF ¶ 113.) Oravec had none of that. He further never created a site plan for the Sunny Isles location, structural elements, mechanical drawings, construction drawings, integration of various elements necessary for the desired amenities, paving patterns, access or service roads, fire escapes, ingress and egress, window shapes, balconies – or actually anything other than a model and a simple sketch of a floor shape with no detail. (*Compare* SOF ¶ 32 *with* SOF ¶ 113.)

The hundreds of architectural drawings necessary to achieve zoning approval and to construct a high-rise building simply cannot be compared to Oravec's tinkering.  And Oravec can prove no substantial similarity therewith.

### c.    *No Substantial – and Certainly No Striking – Similarity*

As set forth above, none of Oravec's "designs" bear a substantial similarity to Trump Palace and Trump Royale.  Thus, the Court should grant summary judgment in favor of Defendants as to Oravec's 1996, 1997, 2002, March 2004 and April 2004 copyright registrations. Moreover, as no substantial similarity can be found, the Court should certainly find that they can be no striking similarity between any of Oravec's various submissions and Trump Palace and Trump Royale.

### D.    Independent Creation

Assuming that Oravec can somehow clear the hurdles of establishing that (1) his "designs" and materials warrant copyright protection and (2) Sieger Suarez's access to his alleged designs, Oravec has no evidence from which to refute independent creation by Sieger Suarez.  Again, there can be no infringement   even if the two copyrighted works are identical if the alleged infringer independently created the work.

In *Calhoun*, the Eleventh Circuit affirmed summary judgment in favor of the defendant because the uncontroverted evidence established his independent creation.  There, Calhoun alleged that McGee infringed his copyright in a musical compilation.  Despite the court noting that "even a casual comparison of the two compositions compels the conclusion that the two compositions are practically identical," *Calhoun*, 298 F.3d at 1232, the court held that there existed no genuine issue of material fact to preclude the summary judgment entered in favor of the defendant, *id.* at 1234-35.

In that case, McGee averred that he "independently created 'Emanuel' during [a] church service in May or June 1976. [He] did not use any pre-existing material as a basis for the song. [He] did not use any sheet music, lead sheets or hymnals." *Id.* at 1233 (internal quotation marks omitted). He further provided affidavits of "witnesses who corroborated his independent creation of 'Emmanuel' during a church service." *Id.* Calhoun did not offer any evidence to contradict these affidavits. Accordingly, the district court correctly held that "McGee's testimony constitutes uncontradicted evidence of independent creation, which fully negates any claim of infringement." *Id.*

Likewise, here, Charles Sieger has testified that, prior to this litigation, he had never seen any of Oravec's materials. (SOF ¶ 46.) Sieger has further explained his use of recurring elements of Sieger Suarez's prior buildings in developing the plans for Trump Palace and Trump Royale, his method of designing from the "inside-out," the reasons and purpose for the differing convex/concave elements and various other features of these residential condominiums. Moreover, the convex/concave early working sketches regarding the Continuum (an unbuilt twin towers solution with similar elements and features to Trump Palace and Trump Royale), as well as the evolution of the computer drawings directly associated with Trump Palace and Trump Royale, establish Sieger's independent creation of the building design at issue here. (SOF ¶¶ 130-33, 136-38.) Moreover, others witnessed the evolution of the key elements that Oravec now claims Sieger Suarez stole from him. (SOF ¶¶ 134-35, 144-45, 155.)

In particular, over the past three decades, Sieger has developed or used the elements of Trump Palace and Trump Royale that Oravec claims were stolen from him — i.e. the brackets, the holes, the bulging, the curved ends, the banana shape, the floor-thru/see-thru units that produce expressed cores, and the above-roofline elevator shafts. (SOF ¶¶ 131, 137.) This accumulation

33

of various parts from previous work led to the design of Trump Palace and Trump Royale. (SOF ¶ 132.) While this continuity and thread of the design work which may not be readily apparent, it is discernable upon close comparison of Sieger's works of the past 25 years. (SOF ¶ 132.)

And just as in Sieger's prior works, Sieger Suarez generated the design of Trump Palace and Trump Royale, from the inside-out. (SOF ¶ 138) That is, Sieger did not "start with a design of a pretty picture of one side of a building," such as alleged here, and "then try to shove stuff in behind it." (SOF ¶ 138.) Instead, Sieger started the design for Trump Palace and Trump Royale, as he does with all buildings, by discussing a program with the client, reviewing the zoning code for any pertinent restrictions, analyzing the site configuration, determining the view corridors from that site, and thereafter generating a floor plan. (SOF ¶ 138.)

In this case, Charles Sieger initially sketched out a rough concept for Trump Palace, which Beatrice Hernandez and Robin Arrington took and used to translate into a computer-generated drawing. (SOF ¶ 133-35.) In creating these initial computer-generated drawings, Sieger instructed Arrington to look for a curved building that she could get to fit in the corner edge of the site, suggesting other projects from which to pull bits and pieces of the design. (SOF ¶ 135.)

This general curvature of Trump Palace was dictated by the zoning requirements and ocean views. Given that the City of Sunny Isles only allows a maximum exposure of 250 feet parallel to Collins Avenue, a general curved, or banana shape, was the obvious solution. (SOF ¶¶ 153-54.) Because the shorter side could face Collins Avenue and comply with City code, the longer side could face the ocean and afford more expansive views. (SOF ¶ 154.) Moreover, Sieger's decision to use the primary concept at issue in the case – the convex/concave element

present in the Collins Avenue side of the Trump Palace and Trump Royale    was witnessed and

discussed with Arrington at the time it occurred.  (SOF ¶ 155.)

At the client's request, Sieger wanted to change the building from all floor-through units

to enable more units on the majority of the floors to ensure use of the maximum allowable

density.  (SOF ¶ 155.)  But simply splitting the units in the banana shape did not generate

sufficient area per unit.  (SOF ¶ 155.)  Accordingly, Sieger Suarez took the back curve radius and

flipped it forward between the two eclipses to extend the floor area out so that Sieger Suarez

could split the middle four units into seven units of sufficient size to sell.  (SOF ¶ 155.)  Oravec's

designs do not even contain this sort of "flipped" curvature on any of his floors – none of his

floors have two convex sides.

Furthermore, the location of the cores occurred to ensure that the building would not

topple over in a wind storm.  (SOF ¶ 143.)  As a matter of function, the cores need to be placed

predominately on the exterior as far out as possible to act as structural support for the building

itself.  (SOF ¶ 143.)  Moreover, Arrington witnessed Sieger independently make the sketches

regarding the placement of the cores.  (SOF ¶¶ 144-45.)

The cores are further expressed above the roofline due to the equipment that they must

house.  (SOF ¶¶ 151-52.)  For decades, Sieger Suarez – like many other architects of high-rise

buildings    have had expressed elevator cores in their buildings.  (SOF 131.)  Trump Palace and

Trump Royale are no different.

Sieger further made the tops of the cores sloped in order to emulate the smokestacks on

cruise ships.  Arrington and Sieger were discussing cruise ships when Sieger "just kind of took

the pencil and drew a slash line and said it looks just like a cruise ship."  (SOF ¶ 152.)  After

playing with the angle somewhat. Sieger eventually arrived at the design for the top of the vertical cores.  (SOF ¶ 152.)

The hole in the middle of the building, which is the spa level in Trump Palace and Trump Royale, was originally designed by Sieger Suarez for the Portofino Tower in 1991 or 1992. Portofino was standing when Oravec drew his first "design" at issue in this lawsuit.  (SOF ¶ 146)

Additionally, only the Hotel and Trump Palace were originally contemplated for the site. (SOF ¶¶ 4-6.)  Thus, the design of the Trump Palace was not done with an eye toward a twin tower solution.  When Dezer acquired yet more ocean front property adjacent to the site, the decision was made to integrate it into one project.  (SOF ¶ 6.)  Sieger Suarez therefore simply decided to mirror Trump Palace and angle the two buildings in such a manner so that the unit owners would not be looking directly into one another's' units.  (SOF ¶ 7.)

Finally, unlike any of Oravec's designs, those for Trump Palace and Trump Royale take into account the necessary garage space for a project this size.  (SOF ¶ 156.)  Sieger Suarez's plans further include significant other features entirely absent in Oravec's materials, including, without limitation:  glass and window size; placement of the glass to withstand wind loads; adequate light and ventilation to the units; louvers or slots in the rooftop elements; balconies and balcony placement; porte-cochere; cabanas; perpendicular sheer walls; composition of elements necessary for service and service vehicles; areas for various amenities.  (SOF 157.)

Oravec cannot offer any evidence to contradict this evolution of the Trump Palace and Trump Royale exterior design features (which, in the case of Sieger Suarez's designs, was driven by designing – not the exterior – but the interior first).  Accordingly, under Eleventh Circuit law, the Court must grant summary judgment in favor of the Sieger Suarez Defendants on Count 1 of Oravec's Second Amended Complaint.

### E.    Waiver

Through his 2002 submission to the Lower Manhattan Development Corporation ("LMDC"), Oravec has waived and/or abandoned any claims of copyright infringement that he may otherwise have had in this case. "Waiver is the voluntary relinquishment of a known right or privilege." *Florida House of Representatives v. U.S. Dep't of* Commerce, 961 F.2d 941, 946 (11th Cir. 1992). Waiver, therefore "requires (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) . . . intention to relinquish such right, privilege, advantage, or benefit." *Dade County v. Rohr Industries, Inc.*, 826 F.2d 983, 990 (11th Cir. 1987).

In accord with the general principles of waiver, an abandonment or waiver of copyright protection occurs when the owner "intends to surrender a copyright interest in his work." *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1398-99 (C.D. Cal. 1990). "To find abandonment, the copyright owner must have clearly manifested that intention through some affirmative act." *Id.* (internal quotation marks and citations omitted).

In *Hadady Corp.*, the court found that plaintiff abandoned his copyright by noting that the "information contained in this letter is protected by U.S. copyright laws through noon EST on the 2d day of its release." *Id.* While plaintiff declared that he did not intend by the two day notice to abandon or shorten Hadady Corp's copyright interest, the court found that that self-serving declaration flied "in the face of the only possible meaning of the two-day copyright notice conveyed, and does not raise a triable issue of material fact." *Id.* at 1399.

Here, the waiver or abandonment is just as clear.  In or around October 2002, Oravec submitted his "design" to the LDMC   the public agency charged with coordinating the development of the World Trade Center site in downtown Manhattan after the terrorist attaches

of September 11, 2001. (SOF ¶ 22.) This design, according to Plaintiff and his experts, constitutes his sole design and encompasses all of his prior iterations (which according to Oravec, include the March 2004 copyright registration materials as well). (SOF ¶ 36.)

As part of the application process, the LMDC required that applicants, like Oravec, acknowledge that they maintained no copyright or other intellectual property rights that form the work submitted for the World Trade Center competition. (SOF ¶ 22.) Oravec therefore executed the form and acknowledge that he "reserve[d] no patent, trademark, copyright, trade secret, or other intellectual property rights in any of the material that forms or is contained in [his] proposal." (SOF ¶ 22.) Accordingly, Oravec stated that no copyright protection attached to his designs. He did so clearly, unequivocally, and knowingly. As no copyright protection therefore exists for Oravec's designs, the Court should enter summary judgment in favor of Defendants on Oravec's claims for copyright infringement.

E.     **Oravec Prohibited From Profiting From His Illegal Acts**

At the heart of Oravec's case is his desire to profit    through attempting to collect both the Sieger Suarez Defendants and Trump/Dezer Defendants' profits     from his illegal activities. Oravec acknowledges that the **only** way the Sieger Suarez Defendants could even have speculatively gotten access to his designs was as a result of his marketing activities in Southern Florida and elsewhere. (SOF ¶¶ 40-112.) But these activities were illegal. The law does not allow one to collect a profit from his illegal acts.

Section 481.223 of the Florida Statutes provides that a "person may not knowingly: (a) [p]ractice architecture unless the person is an architect or a registered architect; . . . (c) [u]se the name or title "architect" or "registered architect," . . . or words to that effect, when the person is not then the holder of a valid license issued pursuant to this part . . . ." Architecture, in turn,

"means the rendering or **offering to render services in connection with the design** and construction of a structure or group of structures which have as their principal purpose human habitation or use, and the utilization of space within and surrounding such structures. These services include planning, providing preliminary study designs, drawings and specifications, job-site inspection, and administration of construction contracts." § 481.203, *Fla. Stat.* (emphasis added). Here, Oravec both practiced architecture and held himself out as an architect. Thus, he committed "a misdemeanor of the first degree." § 481.223, *Fla. Stat.* Importantly, this is not merely a licensing statue but one that criminalizes the practice of architecture to protect the public from unsafe dwellings. *Id.* Despite Oravec's blatant criminal acts, he now attempts to reap a windfall from these illicit activities.

In this case, Oravec's claims are premised on Sieger Suarez somehow obtaining access to his materials as a result of Oravec's illegal offer to render services to various South Florida Developers. But federal courts have long recognized the maxim that "[r]elief will be denied where it appears that the right on which the complainant relies has grown out of a wrong, a breach of duty, or a violation of law." 27A *A. Jur. 2d Equity* § 129; *New York Football Giants, Inc. v. Los Angeles Chargers Football Club, Inc.,* 291 F.2d 471, 473-74 (5th Cir. 1961) (asserting that equity concerns the public, as well as private, interest and "not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public"); *Cartlidge v. Rainey,* 168 F.2d 841, 845 ("It is well settled that equity will not lend its aid to the perpetration of criminal acts.").

In this case, Oravec seeks not only the unknown amount for which he was attempting to solicit his designs but the entire profits from the Trump Grande Project. Without his illegal solicitation of various developers, however, he could not have brought this case. There is simply

no authority that one can recover for copyright infringement when the alleged infringement was induced solely due to Defendants' illegal activities. Such a ruling would be absurd. Accordingly, the Sieger Suarez Defendants request that the Court enter summary judgment in their favor to ensure that Oravec does not profit from his wrongful and illegal practice of architecture.

**F.      Jose Suarez and Charles Sieger Have No Personal Liability**

      **1.      Suarez Did Not Infringe Oravec's Designs**

A fundamental aspect of corporations is the shareholders' limited liability and distinct legal entity from the corporation itself. *See 111 Properties, Inc. v. Lassiter*, 605 So.2d 123, 126 (Fla. 4th DCA 1992) (where the court noted that the "general rule is that corporations are legal entities separate and distinct from the persons comprising them" and "absent fraud, the corporate veil is not pierced" (citations omitted)); *Hanisch v. Clark*, 200 So.2d 601, 604 (Fla. 3rd DCA 1967) (holding that corporation and its two sole stockholders, one of whom was corporation president, were separate entities and could not be regarded as one).

In deference to the corporate structure, therefore, a shareholder will be liable for corporate acts in only limited exceptions. The standard imposed when the shareholder is also an officer is at the very least the same as that applied to officers: the shareholder must have individually participated in the alleged wrongful acts or omissions. *See Florida Specialty, Inc. v. H 2 Ology, Inc.*, 742 So.2d 523 (Fla. 1st DCA 1999). Simply showing control is not enough to hold a shareholder or officer personally liable; the corporate veil may not be pierced absent a showing of improper conduct. *See Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121 (Fla. 1984).

Here, there is no evidence from which to impute liability to Jose Suarez. It is uncontradicted that Sieger designed the building; Suarez did not. Suarez played no role in the conceptual design aspects of the Trump Palace and Trump Royale that are at issue in this case. (SOF ¶ 161.) Accordingly, there is no basis to hold him personally liable.

### 2.    No Evidence to Recover Damages or Profits from Sieger or Suarez

Oravec can point to no evidence in the record to establish any damages as a result of any personal conduct by Sieger or Suarez. He can point to no evidence to establish any revenues or profits derived by Sieger or Suarez, personally, as a result of the alleged infringing activity. Accordingly, summary judgment should be entered as to Sieger and Suarez in their individual capacities.

### G.    Oravec's Claims are Barred by the Doctrine of Laches

To avoid duplication of argument, the Sieger Suarez Defendants simply incorporate by reference the Trump/Dezer Defendants' argument concerning the doctrine of laches.

## III.   CONCLUSION

Through this lawsuit, Oravec threatens the very underpinnings of the practice and profession of architecture. Oravec seeks to gain a monopoly on the idea of a convex/concave highrise building. He has admitted that. But architecture, by its very nature, builds upon ideas and expressions that have existed for centuries and those that may have been set forth just last week. The Copyright Act – contrary to what Oravec would have this Court believe – encourages that progression. For this reason, it explicitly does not protect ideas. As famed author Dan Brown recently commented upon prevailing against claims of copyright infringement: a novelist must "be free to draw appropriately from historical works without fear that he'll be sued and

forced to stand in a courtroom that call into question his very integrity as a person." *Miami Herald*, April 8, 2006 at 4A.

Indeed, Oravec's Second Amended Complaint and deposition testimony impermissibly attempt to combine pieces and parts of five separate registrations (four of which seek protection under § 108(a)(8) and one of which seeks protection under § 108(a)(5)) in order to cobble together enough "elements" to make a claim.  But this attempt must fail.  Each work must be judged on its own merits.  And when one does that, it becomes clear that no reasonable juror could find in Oravec's favor on his claims that the Sieger Suarez Defendants infringed any of his 1996, 1997, 2002, March 2004, or April 2004 copyright registrations.

Again, Oravec's claims of infringement as to his architectural works embodied in his 1996, 1997, 2002, and April 2004 copyright registrations must fail.  None of these materials include any detail sufficient to warrant protection as an architectural work.  Likewise, Oravec's claim of infringement as to his PGS work contained in the March 2004 registration has no merit.  Oravec made no plans for his "5177" model.  Thus, there are no claims that the Sieger Suarez Defendants could even arguably have copied Oravec's non-existent architectural plans.  As no plans were copied and – as a matter of law – one can construct a building that is identical to that depicted in a PGS Work so long as the actual, underlying architectural plans themselves are not copied, Oravec's claim of infringement of his March 2004 application must be rejected.

Moreover, as to all five copyright registrations, Oravec admits that what he thought he had copied was his idea for a building that would have alternating convex/concave elements.  And his drawings simply set forth the very limited ways in which that idea could be expressed in a high-rise building.  Accordingly, Oravec's claims of infringement cannot withstand summary

judgment because ideas are simply do not garner protection under the Copyright Act    and the merger doctrine further eliminates protection for Oravec's expression of his idea.

Trump Palace and Trump Royale are furthermore not substantially similar to any of Oravec's materials.  A simple comparison readily bears that out.  And even with respect to that one model, "5177", which Oravec depicts in the body of his Second Amended Complaint, the few similarities that exist are far eclipsed by the differences.  Trump Palace and Trump Royale simply do not have the *sine-qua-non* of Oravec's designs    they do not have staggering convex/concave floor plates.  This, along with the myriad other elements and design details lacking in Oravec's plan, eliminate any argument of substantial – and therefore, certainly, striking    similarity.

Oravec's claim also fails because Sieger Suarez independently created the design of Trump Palace and Trump Royale.  Oravec has no evidence to rebut Sieger's explanation of his independent creation or the testimony of the witnesses thereto.  Accordingly, under Eleventh Circuit precedent, he cannot maintain a claim for copyright infringement.

Finally, Oravec cannot maintain his claim against Jose Suarez and Charles Sieger in their individual capacities.  Suarez had no role in the conceptual design of Trump Palace and Trump Royale.  And Oravec further can point to know profits or damages for which Suarez and Sieger would be liable.  Accordingly, the Court should enter summary judgment finding that these two individuals have no personal damage exposure in this matter.

In sum, for varying reasons, Oravec simply cannot establish a valid copyright and copying (access and substantial similarity to protected elements) of any of his registrations: 1996, 1997, 2002, March 2004, or April 2004.  Oravec has no claim for copyright infringement regardless of his desire to obtain a windfall of $120 million for his generalized idea and

depictions thereof.  For any and all of these reasons, the Sieger Suarez Defendants respectfully requests that the Court enter summary judgment in their favor and put an end to this meritless litigation.

WHEREFORE the Sieger Suarez Defendants respectfully request that the Count enter an order granting this Motion for Summary Judgment.

Respectfully submitted,

BURLINGTON, SCHWIEP, KAPLAN
  & BLONSKY, P.A.
Counsel for Defendant THE SIEGER SUAREZ
ARCHITECTURAL PARTNERSHIP INC.
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261

By: _____
Robert K. Burlington
Florida Bar No. 261882
Susan E. Mortensen
Florida Bar No. 676446

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic mail and Federal Express this 10th day of April, 2006 upon the following:

Barry L. Haley, Esq.
Malin, Haley & DiMaggio P.A.
1936 South Andrews Avenue
Ft. Lauderdale, Florida 33316
Tel: 954-763-3303
Fax: 954-522-6507

*Local Counsel for Plaintiff*

Maria A. Meginnes, Esq.
James N. Nowacki, Esq.
Michelle Francis, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601
Tel: 312-861-2000
Fax: 312-861-2200

*Pro Hac Vice Counsel for Plaintiff*

Herman J. Russomanno, Esq.
Robert J. Borrello, Esq.
Russomanno & Borrello, P.A.
Museum Tower, Suite 2101
150 West Flagler Street
Miami, Florida 33130
Tel: 305-373-2101
Fax: 305-373-2103

*Counsel for Sunny Isles Ventures L.C., Dezer
Properties LLC, Dezer Development, LLC, Michael
Dezer, Gil Dezer, The Trump Corporation, Donald
Trump, Residences at Ocean Grande, Inc., and Roy
Development Holdings, LLC*

Susan E. Mortensen

45