# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Thomas K. Kahn
Clerk

REC'D by _____ D.C.

JUN 1 7 2008    For rules and forms visit
www.ca11.uscourts.gov

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

June 12, 2008

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1813

Filed
REC'D by _____ D.C.

JUN 1 6 2008

STEVEN M. LARIMORE
CLERK U S DIST CT
S. D. of FLA. MIAMI

**Appeal Number: 06-14495-DD**
Case Style: Paul Oravec v. Sunny Isles Luxury Ventures
District Court Number:  04-22780 CV-PAS

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:

Bill of Costs
    Original Exhibits, consisting of: five boxes
    Original record on appeal or review, consisting of: eighteen volumes

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

# United States Court of Appeals

## For the Eleventh Circuit

No. 06-14495

District Court Docket No.
04-22780-CV-PAS

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

May 14, 2008

THOMAS K. KAHN
CLERK

PAUL ORAVEC,

               Plaintiff-Appellant,

versus

SUNNY ISLES LUXURY VENTURES, L.C.,
SIEGER SUAREZ ARCHITECTURAL PARTNERSHIP INC.,
DEZER PROPERTIES LLC,
DEZER DEVELOPMENT, LLC,
MICHAEL DEZER, et al.,

               Defendants-Appellees.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:

Deputy Clerk
Atlanta, Georgia

--------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
--------------------------------------------------------------

## JUDGMENT

    It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE

JUN 1 2 2008

U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:    May 14, 2008
For the Court:    Thomas K. Kahn, Clerk
By:    Jackson, Jarvis

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14495

_____

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| MAY 14, 2008 |
| THOMAS K. KAHN |
| CLERK |

D. C. Docket No. 04-22780-CV-PAS

PAUL ORAVEC,

Plaintiff-Appellant,

versus

SUNNY ISLES LUXURY VENTURES, L.C.,
SIEGER SUAREZ ARCHITECTURAL PARTNERSHIP INC.,
DEZER PROPERTIES LLC,
DEZER DEVELOPMENT, LLC,
MICHAEL DEZER, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 14, 2008)

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Plaintiff, Paul Oravec, brought this action under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, against several parties associated with the Trump Palace and the Trump Royale (collectively, "Trump Buildings"), twin high-rise condominiums in Sunny Isles Beach, Florida. Oravec alleged that these defendants infringed his copyrighted architectural designs through the design, development, and construction of the Trump Buildings. The district court granted summary judgment to defendants and denied Oravec's motion for leave to file a third amended complaint. After thorough review of the record, we conclude that the grant of summary judgment was proper and that there was no abuse of discretion in the denial of leave to amend. Accordingly, we affirm.

## I. BACKGROUND

Oravec was born in Czechoslovakia and was trained and licensed as an architect in that country. After immigrating to the United States in 1982, Oravec worked as a designer for architectural firms in New York, and later for a Miami firm that designs and builds real estate and promotional displays. Although not licensed to practice architecture in the United States, Oravec has continued to pursue that interest during his spare time.

In 1995 and 1996, Oravec developed a design for a high-rise building that

2

featured the use of alternating concave and convex segments and elevator cores protruding through the building's roofline. Oravec applied to register this design with the U.S. Copyright Office and was issued a certificate of registration on July 1, 1996 ("1996 Copyright"). After making certain refinements, Oravec obtained an additional copyright registration on May 2, 1997 ("1997 Copyright").[1]  Hoping to see his design constructed, Oravec undertook efforts to market it to developers in South Florida and elsewhere. Between 1996 and 1999, Oravec mailed versions of his design to as many as 120 individuals and companies and made several in-person presentations to developers.

During the same time period, defendants Michael and Gil Dezer initiated the process of developing the beachfront resort that would be the site of the Trump Buildings. Michael Dezer purchased a parcel of land in Sunny Isles Beach and collaborated on its development with a company named Colonial Ridge Development, LLC ("Colonial Ridge"). In the late 1990s, Colonial Ridge hired defendant Sieger Suarez Architectural Partnership, Inc. ("Sieger Suarez") to design two buildings for the property. The original Sieger Suarez designs consisted of a

---

[1] Oravec obtained a copyright registration for another version of his design in 2002. Oravec admitted that the defendants could not have copied this work because their designs were already completed at the time the 2002 materials were created. The court also found that Oravec had abandoned any copyright interest he had in the 2002 design. Oravec does not challenge these findings on appeal.

condominium hotel and a Y-shaped residential condominium.[2]  Subsequently, the

Dezers acquired additional land and decided that a larger residential condominium

should be constructed.  Sieger Suarez modified its design, and the result was the

design for the current Trump Palace. The district court found that this design was

substantially complete in March of 2000.  Later, after the purchase of additional

property, the project was expanded to include a second residential condominium.

Sieger Suarez designed this second building, which would become the Trump

Royale, as essentially a mirror image of the Trump Palace.

On February 15, 2003, Oravec saw a newspaper advertisement featuring a

photograph of a model of the Trump Palace.  The following day, he visited the

resort's sales office and viewed models and brochures depicting the Trump

Buildings.  At the time, neither building had been constructed; only the foundation

of the Trump Palace had been laid.  Believing that the designs resembled his own,

Oravec consulted with attorneys and was advised to secure copyright registrations

for all of his unregistered designs in order to satisfy the jurisdictional prerequisites

for an infringement action. *See* 17 U.S.C. § 411(a) ("[N]o action for infringement

of the copyright in any United States work shall be instituted until preregistration

or registration of the copyright claim has been made in accordance with this

---

[2] The hotel is now known as the Trump International Sonesta Resort.  Its design is not at issue in this case.

4

title.").

Oravec thereafter obtained two additional copyright registrations, only one

of which (the "March 2004 Copyright") is relevant to this appeal. On this

registration form, Oravec indicated that the submitted materials were derivative of

the works covered by his three prior registered copyrights, which he listed by

registration number. He also provided the following statement in space 6b, under

the subheading "Material Added to This Work": "This material includes all

previous designs and versions and depict [sic] them in 3-D models/photographs,

renderings/43 pages." Oravec initially attempted to claim protection for these

materials as architectural works, as he had done with respect to his previous

designs. *See* 17 U.S.C. § 102(a)(8). However, after receiving his application, the

Copyright Office informed Oravec that this claim was inconsistent with his

statement that the claim pertained to sculptures, artwork, and photographs. *See* 17

U.S.C. § 102(a)(5) (establishing copyright protection for "pictorial, graphic, and

sculptural works"). The Office advised Oravec: "If you have created original

sculptures, artwork, and photographs that were based on previously registered

architectural work claims, but you are not now registering any new architectural

work authorship and plans, then space 2 ["Nature of Authorship"] must reflect the

new claim as described in space 6b" (emphasis omitted). The Office directed

Oravec to amend his application by deleting the architectural work claim and checking only the boxes for "3-Dimensional sculpture," "2-Dimensional artwork," and "Photograph." Oravec made these changes and re-filed his application.

In November 2004, Oravec filed suit under the Copyright Act against numerous individuals and entities associated with the Trump Buildings. Specifically, Oravec sued Sieger Suarez, its principals Charles M. Sieger and Jose J. Suarez, and real estate developers Sunny Isles Luxury Ventures L.C. and Dezer Properties LLC on a theory of direct copyright infringement. In addition, Oravec asserted claims of vicarious copyright infringement and contributory copyright infringement against various developer entities and their principals.

In April 2006, the parties filed cross motions for summary judgment on a variety of issues. The district court held three summary judgment hearings in July 2006. During the first hearing on July 7, the court expressed the view that Oravec could not prevail on his claims pertaining to the March 2004 Copyright because the construction of a building cannot, as a matter of law, infringe the copyright in a pictorial, graphic, or sculptural work ("PGS work") registered under 17 U.S.C. § 102(a)(5). In response, Oravec filed a series of new copyright applications with the Copyright Office on July 11 in order to register the March 2004 Copyright materials as architectural works under § 102(a)(8). The following day, Oravec

6

sought leave to file a third amended complaint based on these new registrations.
At a hearing that same day, the court denied leave to amend because the
registration certificates had yet to issue and because the deadline for filing
amendments had passed more than a year earlier. Nine days later, Oravec received
the requested certificates from the Copyright Office and moved the court to
reconsider its denial of leave to amend.

On July 24, 2006, the court entered an order granting summary judgment to
defendants on Oravec's infringement claims and denying Oravec's motion to
amend.[3] The court found, *inter alia*, that Oravec could not establish infringement
of his 1996 and 1997 Copyrights because no reasonable jury could find that the
Trump Buildings are substantially similar to Oravec's 1996 and 1997 designs. The
court found that Oravec could not prevail on the basis of his March 2004
Copyright for the reasons indicated at the July 7 hearing. As to Oravec's motion to
amend, the court reiterated its conclusion that Oravec's delay was unreasonable
given the expiration of the deadline for filing amendments. The court further noted
that trial was six weeks away and that Oravec had been on notice of the challenge
to his March 2004 Copyright claim since April 10, 2006, the date the defendants

---

[3] These rulings disposed of all other issues in the case. Nonetheless, the court also ruled
on several additional claims and defenses raised by the parties. Because we affirm the district
court on the dispositive issues, we need not address the other portions of its decision.

filed their motion for summary judgment. Oravec now challenges each of these rulings.

## II. DISCUSSION

### A. Summary Judgment Standard

We review the district court's grant of summary judgment *de novo*, construing all evidence in the light most favorable to Oravec, the non-moving party. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000). Some courts have viewed summary judgment as inappropriate in the copyright infringement context because of the inherently subjective nature of the inquiry. *See Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994) (citing *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir. 1980)). However, we have recognized that "non-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999) (per curiam) ("well-reasoned" district court opinion affirmed and annexed to Eleventh Circuit ruling); *accord Beal*, 20 F.3d at 459.

### B. 1996 and 1997 Copyrights

8

### 1. Legal Framework

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991). "If the plaintiff does not have direct proof of copying, the plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are 'substantially similar.'" *Herzog*, 193 F.3d at 1248.[4] Here, the district court found that Oravec owned valid copyrights in his 1996 and 1997 designs, and that there were disputed issues of fact as to whether certain defendants had access to those designs. Thus, summary judgment turned on the issue of substantial similarity.

We have defined substantial similarity as existing "where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982) (internal quotation marks omitted). Not all copying constitutes infringement, however, *see Feist*, 499 U.S. at 361, 111 S. Ct. at 1296, and therefore we have emphasized that the substantial similarity analysis "must

---

[4] If the plaintiff cannot demonstrate access, he or she still may establish copying by showing that the works are "strikingly similar." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1253 (11th Cir. 2007).

focus on similarity of expression, *i.e.*, material susceptible of copyright protection." *Beal*, 20 F.3d at 459 n.4; *see also Leigh*, 212 F.3d at 1214 (stating that a copyright plaintiff "must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work *with regard to its protected elements*"). "Thus, in an action for infringement, it must be determined both whether the similarities between the works are substantial from the point of view of the lay [observer] and whether those similarities involve copyrightable material." *Herzog*, 193 F.3d at 1248.[5]

---

[5] In *Herzog*, we approved a district court opinion that framed this analysis as a two-part inquiry similar to that established by the Ninth Circuit in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977), and its progeny. That approach involves "extrinsic" and "intrinsic" tests, which the court in *Herzog* described as follows:

> Under the extrinsic test, a court will inquire into whether, as an objective matter, the works are substantially similar in protected expression. As a part of this test, a court will determine whether a plaintiff seeks to protect only uncopyrightable elements; if so, the court will grant summary judgment for defendant. Under the extrinsic test, expert testimony and analytic dissection are appropriate. Under the intrinsic test, a court will determine whether, upon proper instruction, a reasonable jury would find that the works are substantially similar. A court may grant summary judgment for defendant as a matter of law if the similarity between the two works concerns only noncopyrightable elements of the plaintiff's work *or* if no reasonable jury would find that the two works are substantially similar.

193 F.3d at 1257 (citations omitted).

This aspect of the *Herzog* decision is something of an anomaly in our copyright jurisprudence. Prior to that case, the extrinsic/intrinsic framework had not been recognized in this circuit, and we have not referenced it in subsequent published decisions dealing with the issue of substantial similarity. *See, e.g., Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266-67 (11th Cir. 2001); *Leigh*, 212 F.3d at 1214-16. In any event, we believe that the *Herzog*

(continued...)

10

In identifying the protected elements of a plaintiff's work, the court must be mindful of the fundamental axiom that copyright protection does not extend to ideas but only to particular expressions of ideas. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery . . . ."); *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 556, 105 S. Ct. 2218, 2228, 85 L. Ed. 2d 588 (1985) ("No author may copyright his ideas or the facts he narrates."); *Corwin*, 475 F.3d at 1250 (same). This distinction—known as the idea/expression dichotomy—can be difficult to apply, as there is no bright line separating the ideas conveyed by a work from the specific expression of those ideas. As Judge Learned Hand recognized in an influential opinion: "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc*." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

Nevertheless, in attempting to distinguish between ideas and expression, it is

---

[5](...continued)

formulation is not useful in this case because the two tests ultimately merge into a single inquiry: whether a reasonable jury could find the competing designs substantially similar at the level of protected expression. *See Beal*, 20 F.3d at 459 n.4 (noting that "both paths that lead to summary judgment—similarity that concerns only noncopyrightable elements, or the impossibility of a properly instructed jury finding substantial similarity—may involve a similar inquiry").

11

useful to note the policy purposes served by the distinction. *See Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1285 (10th Cir. 1996). The idea/expression dichotomy seeks to achieve a proper balance between competing societal interests: that of encouraging the creation of original works on the one hand, and that of promoting the free flow of ideas and information on the other. *See Feist*, 499 U.S. at 349-50, 111 S. Ct. at 1290 ("[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work."); *accord Suntrust Bank*, 268 F.3d at 1264; *Herzog*, 193 F.3d at 1248. Therefore, "in defining protectable expression, the court should 'neither draw the line so narrowly that authors, composers and artists will have no incentive to produce original literary, musical and artistic works, nor [should the court] draw it so broadly that future authors, composers and artists will find a diminished store of ideas on which to build their works.'" *Meade v. United States*, 27 Fed. Cl. 367, 372 (Fed. Cl. 1992) (alteration in original) (quoting Paul Goldstein, *Copyright: Principles, Law, and Practice* § 2.3.1.2 (1989)), *aff'd*, 5 F.3d 1503 (Fed. Cir. 1993).

In addition to the idea/expression dichotomy, certain statutory provisions specific to architectural works further define the scope of available copyright protection. The Copyright Act's definition of "architectural work" excludes

12

"individual standard features" from the protectible elements of the design. 17
U.S.C. § 101. According to legislative history, such features include "common
windows, doors, and other staple building components." H.R. Rep. No. 101-735
(1990), *as reprinted in* 1990 U.S.C.C.A.N. 6935, 6949; *see also T-Peg, Inc. v.
Vermont Timber Works, Inc.*, 459 F.3d 97, 110 (1st Cir. 2006) (citing legislative
history). At the same time, however, the statute includes within the definition of
"architectural work" "the arrangement and composition of spaces and elements in
the design." 17 U.S.C. § 101. This definition reflects Congress's awareness that
"creativity in architecture frequently takes the form of a selection, coordination, or
arrangement of unprotectible elements into an original, protectible whole." H.R.
Rep. No. 101-735, *as reprinted in* 1990 U.S.C.C.A.N. at 6949. Thus, while
individual standard features and architectural elements classifiable as ideas are not
themselves copyrightable, an architect's original combination or arrangement of
such features may be. *See Corwin*, 475 F.3d at 1251 ("[A] work may be protected
by copyright law when its otherwise unprotectable elements are arranged in a
unique way."); *T-Peg*, 459 F.3d at 110 (noting that combination of individual
standard features in architectural work may be copyrightable); *Sturdza v. United
Arab Emirates*, 281 F.3d 1287, 1296 (D.C. Cir. 2002) (observing that artist's
selection, coordination, and arrangement of color may be protectible, even though

13

color itself is not).

## 2. Comparison of Works

Oravec bases his infringement claims on the following elements that he contends are present in both his designs and the Trump Buildings: (1) alternating concave and convex sections; (2) three prominent elevator shafts that protrude above the roof of the building; (3) rounded building ends; (4) constant radius curves; (5) holes in the building; (6) a twin tower design; (7) see-through floor plans; (8) a circular plaza; (9) a central fountain; and (10) a rooftop pool and landscape elements.[6]  Examining these elements individually and collectively, the district court determined that the similarities between the Oravec designs and the Trump Buildings exist only at a conceptual level.  Accordingly, the court concluded that no reasonable jury, properly instructed, could find the competing works substantially similar without implicitly finding that Oravec owns a copyright in an idea.  For the reasons discussed below, we agree.[7]

As the district court noted, the key distinctive features of Oravec's designs are their use of alternating concave and convex sections and their use of three

---

[6] The first five of these elements appear in Oravec's 1996 design.  The remaining elements were added in the 1997 design.

[7] To illustrate our analysis, we have attached selected images of the designs as appendices to this opinion.  Appendix A shows Oravec's 1997 design, and Appendix B shows the Trump Palace as constructed.

14

partially exposed elevator towers extending above the buildings' roof lines. While such features also are present in the Trump Buildings, a comparison of the works reveals numerous significant differences in the expression of these elements. As to the concave/convex concept, one readily apparent difference is the fact that the alternating segments appear on both sides of Oravec's designs but only on one side of the Trump Buildings. Even when viewing the Trump Buildings from that side, however, several other dissimilarities are evident. For example, Oravec's designs contain five alternating segments, while the Trump Buildings have only three. Additionally, the segments in Oravec's designs extend across the entire face of the building, while those in the Trump Buildings appear only in the middle portion between the two outer elevator towers. In Oravec's designs, these segments are long and narrow, and each segment is placed on one side of the three elevator towers so as to create a void throughout the vertical center of the building. In the Trump Buildings, the segments appear only on the façade of the building, and there is no vertical void created. These differences are reflected in the buildings' respective floor plans. Oravec's 1997 design measures 320 feet long and 42 feet wide, and the entire floor plan has a pronounced, "banana-shaped" curve to it. The Trump Buildings have a more rectilinear shape, measuring 260 feet long and 72 feet wide at their narrowest points.

15

The expression of the elevator towers also differs significantly. Oravec's elevator towers are free-standing and are located within the space created by the alternating convex and concave sections of the building. The Trump Buildings' elevator towers are located within the solid structure of the building. In addition, in Oravec's designs, a viewer can see only certain sections of the elevator towers because they are partially obstructed by the alternating convex and concave sections. In the Trump Buildings, the viewer can see the exteriors of the outer two elevator towers through the entire length of the building; only the center tower is partially obscured. The towers also differ in shape and orientation. Oravec's elevator towers are cylindrical, while those in the Trump Buildings are ovals. In Oravec's designs, the towers are clustered in the center of the building, and the middle tower is thicker than the two outer two. The towers in the Trump Buildings are spread out evenly, and all three are equal in diameter. Further, the two outer towers in the Trump Buildings "are angled inward so that the leading edge of all three towers orient toward a focal point outside the building." *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1170 (S.D. Fla. 2006). Given that Oravec's towers are cylindrical, this feature is absent in his designs. Finally, the tops of the Trump Buildings' towers are sloped so as to give the effect of smokestacks on a cruise ship. The towers in Oravec's designs are horizontal across

16

the top.

The remaining elements identified by Oravec—the use of rounded building ends, a constant radius on individual floor plans, holes in the building, a twin-tower design, "see-through" units, a circular plaza, a central fountain, and a rooftop pool with landscape elements—are best characterized as either individual standard features or ideas. *Cf. Sturdza*, 281 F.3d at 1297 ("In and of themselves, domes, wind-towers, parapets, and arches represent ideas, not expression."). We agree with the district court that the expression of these elements in the Oravec designs is not substantially similar to their expression in the Trump Buildings. For example, in Oravec's designs, the twin tower concept is expressed such that it appears that one building could fit into the other; the Trump Buildings lack this feature. The holes in the buildings also differ significantly. As noted, Oravec's designs contain a space from the ground through the top of the building. The Trump Buildings have only a small horizontal gap. As to the rounded building ends, Oravec's designs have full wrap-around terraces, which create a visually smooth façade. The Trump Buildings have individual balconies, creating a more jagged appearance in the rounded ends.

With respect to the circular plazas, the district court properly found that these elements are not substantially similar because Oravec's plaza lacks the

17

intricate details expressed in that of the Trump Buildings. The same conclusion applies to the use of a circular fountain in each design. As to the constant radius curves and "see-through" floor plans, we have already noted that the floor plans in the respective designs differ dramatically. Finally, Oravec points to his use of a rooftop pool with landscape elements. However, the Trump Buildings do not have a rooftop pool, and the landscape elements in those buildings are not similar to any such features that are discernible in Oravec's designs.

These differences, as well as others, preclude a finding of substantial similarity. While it is true that Oravec's designs and the Trump Buildings have a number of features in common, those elements are similar only at the broadest level of generality. At the level of protected expression, the differences between the designs are so significant that no reasonable, properly instructed jury could find the works substantially similar. As the district court observed, to conclude otherwise would require a finding that Oravec owns a copyright in the concept of a convex/concave formula or in that of using three external elevator towers that extend above the roof of a building. Such a conclusion would extend the protections of copyright law well beyond their proper scope. *Cf. Ale House Mgmt. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir. 2000) (affirming grant of summary judgment on claim that defendant copied plaintiff's use of "an island or

18

peninsula-shaped bar to bisect a seating area which has booths on one side and stool seating on the other," because, "at this level of generality, [plaintiff's] design is nothing more than a concept"); *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984) (affirming grant of summary judgment on claim that defendant infringed plaintiff's architectural designs because "[t]he 'idea' of a tower structure certainly is not copyrightable").

For similar reasons, we also reject Oravec's argument that he can establish substantial similarity on the basis of his selection of design elements. In Oravec's view, the fact that the same combination of elements appears in both his designs and the Trump Buildings should have precluded summary judgment, notwithstanding the differences in the expression of those elements. However, while it is clear that an architect's original selection or combination of elements can warrant copyright protection, *see Corwin*, 475 F.3d at 1251; *T-Peg*, 459 F.3d at 115, the selection that Oravec is seeking to protect is too generalized to qualify as protected expression. The copyright claimed by Oravec would encompass any building that combined a concave/convex structure, three external and protruding elevator towers, and various common building features, however any of these elements might be expressed. Were we to grant him such a right, we would effectively bar all other architects from incorporating these concepts into new and

19

original designs. That result would lead to "a diminished store of ideas" available for future works, *Meade*, 27 Fed. Cl. at 372, and thus would be contrary to the fundamental purposes of copyright law. *See Feist*, 499 U.S. at 349-50, 111 S. Ct. at 1290.

Accordingly, we affirm the grant of summary judgment as to Oravec's 1996 and 1997 Copyrights.

### C. March 2004 Copyright

"[T]he holder of a copyright in an architectural plan . . . has two forms of protection, one under the provision for an 'architectural work' under 17 U.S.C. § 102(a)(8), and another under the provision for a 'pictorial, graphical, or sculptural work' under 17 U.S.C. § 102(a)(5)." *T-Peg*, 459 F.3d at 109-10. As noted, Oravec registered his March 2004 materials as PGS works rather than as architectural works. The district court held that Oravec could not establish infringement of these works because, unlike an architectural work copyright, a PGS copyright does not protect against the construction of a building based on copyrighted architectural plans; it only prohibits copying of the plans themselves. Oravec does not challenge this legal conclusion, for which there is ample support.[8] Instead, he

---

[8] *See, e.g.*, *Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 899 (5th Cir. 1972) (copyrighted architectural plans do not confer exclusive right to reproduce the depicted building); *Nat'l Med. Care, Inc. v. Espiritu*, 284 F. Supp. 2d 424, 435 (S.D.W.Va. 2003) ("[A]n
(continued...)

argues that the district court erred by refusing to exercise jurisdiction over his claims under the so-called "effective registration" doctrine.

The Copyright Act provides that "no action for infringement . . . shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). This registration requirement is a jurisdictional prerequisite to an infringement action. *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1488 & n.4 (11th Cir. 1990). Oravec notes, however, that courts have eschewed strict application of the registration requirement in cases where a party owns both a pre-existing work and a derivative work that incorporates elements of the original. In such cases, the registration of the derivative work has been deemed sufficient to permit a claim based on the underlying work, even if that work was not registered.

Oravec directs our attention to several cases in which courts have exercised

---

[8](...continued)
as-built structure or feature cannot be an infringing copy of a technical drawing."); *Demetriades v. Kaufmann*, 680 F. Supp. 658, 664 (S.D.N.Y. 1988) ("[A]lthough an owner of copyrighted architectural plans is granted the right to prevent the unauthorized copying of those plans, that individual . . . does not obtain a protectable interest in the useful article depicted by those plans."); *see also* 1 Melville V. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.08[D][2][a], at 2-123 to 2-124 (2007) (noting that preponderance of authority has denied liability for construction based on copyrighted plans absent a separate act of infringement). Several of these cases were decided prior to the enactment of the Architectural Works Copyright Protection Act ("AWCPA"), which extended copyright protection to "architectural works" as a new category of authorship. *See Espiritu*, 284 F. Supp. 2d at 434. However, the scope of copyright protection for architectural plans registered under § 102(a)(5) was unaffected by the AWCPA. *See T-Peg*, 459 F.3d at 109.

jurisdiction on the basis of this effective registration principle. For example, in *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739 (2d Cir. 1998), the publisher of a street map of New York City brought an infringement action against a competitor. The registration certificate relied upon by the plaintiff stated that the copyrighted work was derivative of a "Streetwise Manhattan map carrying a copyright notice date of 1984, 1985." *Id.* at 746 (quoting registration certificate). The later map added subway and bus notations to the original. The defendants argued the registration certificate covered only those additions, and that the action therefore could not be sustained absent a separate registration for the earlier map. The court disagreed, holding that, because the plaintiff owned the copyright in both maps, "the registration certificate relating to the derivative work . . . will suffice to permit it to maintain an action for infringement based on defendants' infringement of the pre-existing work." *Id.* at 747. *See also, e.g.*, *Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 631 (6th Cir. 2001) (acknowledging "cases that permit infringement suits to proceed on registered derivative works even though some of the underlying foundational works were not formally registered"); *In re Indep. Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1469, 1473 (D. Kan. 1997) (holding that registration of derivative service manuals and software was sufficient to allow infringement claim based on preexisting works authored by same party);

22

*Greenwich Film Prods. v. DRG Records, Inc.*, 833 F. Supp. 248, 251-52 (S.D.N.Y. 1993) (holding that registration for motion picture was sufficient to cover musical compositions contained therein where plaintiff owned copyrights in both); 2 Nimmer & Nimmer, *supra*, § 7.16[B][2][c], at 7-174 ("[W]hen the same party owns the derivative or collective work plus the underlying elements incorporated therein, its registration of the former is 'sufficient to permit an infringement action on the underlying parts, whether they be new or preexisting.'" (quoting *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 284 (4th Cir. 2003))).

Oravec argues that the effective registration doctrine is applicable to the facts of this case. He contends that, because he owns the architectural works depicted in his March 2004 materials, the March 2004 Copyright effectively registered those prior works. Therefore, he argues, the works need not be formally registered as architectural works in order to receive protection as such.

Oravec's reliance on the effective registration doctrine is misplaced. As indicated, the cases applying that principle involved derivative or collective works that incorporated material from unregistered preexisting works. Here, Oravec's March 2004 registration certificate does not identify any unregistered preexisting works. In fact, on the portion of the certificate calling for the identification of preexisting material, Oravec listed only his 1996, 1997, and 2002 Copyrights—i.e.,

23

registered works. Oravec obviously does not need to rely on the effective

registration doctrine to assert claims based on those designs. Now, however,

Oravec appears to be arguing that the relevant "preexisting" works are the three-

dimensional models registered by the March 2004 Copyright itself. According to

Oravec, these works are preexisting because the photographs and computer

renderings that were registered at the same time depict the models, and thus are

derivative works. That interpretation, however, is not apparent from the

registration certificate, which makes no distinction between the models and the

other registered materials. It merely indicates that the models, photographs, and

renderings are derivative of Oravec's three previously registered designs.

At least one other court has found subject matter jurisdiction lacking where

the registration certificate relied upon by the plaintiff did not properly identify the

preexisting work upon which the infringement claim was based. In *I.M.S. Inquiry

Management Systems, Ltd. v. Berkshire Information Systems, Inc.*, 307 F. Supp. 2d

521 (S.D.N.Y. 2004), the plaintiff alleged that the defendant copied material from

its website. The information provided on the plaintiff's registration certificate

indicated that the protected work was completed and first published after the

copying was alleged to have occurred. The plaintiff contended that the infringed

work was preexisting matter, and that therefore the registration of the latter work

extended to the earlier material, which the plaintiff also owned. *See id.* at 528.

The court rejected this argument, finding that "the portion of the

Registration Certificate requiring the identification of 'Preexisting Material' would

have to refer to the preexisting matter that is the basis of this infringement action."

*Id.* at 529. In the court's view, the plaintiff's failure to provide such information

distinguished the case from *Streetwise Maps*, where the preexisting work was

identified on the registration certificate for the derivative work. *Id.* In *I.M.S.*, by

contrast, there was no indication that the plaintiff's registration covered the work at

issue in the suit, apart from the plaintiff's "current protestations to [that] effect."

*Id.* The court found such assertions insufficient to establish subject matter

jurisdiction. *Id.*

We find the *I.M.S.* court's reasoning persuasive and applicable to the facts of

this case. With the exception of his three prior registered designs, Oravec's March

2004 registration certificate does not identify any preexisting architectural works

that the registered materials are based on or incorporate. *See* 17 U.S.C. § 409(9)

(providing that application for copyright registration shall include, "in the case of a

compilation or derivative work, an identification of any preexisting work or works

that it is based on or incorporates"). In particular, the certificate gives no

indication that Oravec was attempting to claim separate protection for his three-

dimensional models as preexisting architectural works. Oravec's "current protestations" that the models should be treated as such cannot satisfy the registration requirement of § 411(a). *See I.M.S.*, 307 F. Supp. 2d at 529.[9]

Moreover, even assuming that Oravec created preexisting architectural works, he is attempting to sue on an aspect of those works—the right to prevent construction of buildings embodying his design—that is not included in the PGS work he did register. As discussed, courts recognizing the effective registration doctrine have held that the registration of a derivative work satisfies the registration requirement for all aspects of the *registered* work, even the aspects copied from an unregistered preexisting work, so long as the owner of both copyrights is the same. *See, e.g.*, *Streetwise Maps*, 159 F.3d at 747. But this theory only applies to aspects of the underlying work that are actually incorporated into the registered work. *See* 2 Nimmer & Nimmer, *supra*, § 7.16[B][2][c], at 7-173 n.105.7 ("The assumption is that the derivative work that is registered embodies all the features of the underlying work on which suit is premised."). A

---

[9] Our conclusion is not altered by the statement that Oravec provided on the registration certificate under the subheading "Material Added to This Work": "This material includes all previous designs and versions and depict [sic] them in 3-D models/photographs, renderings . . . ." This statement is insufficient for effective registration purposes, as it does not indicate what specific preexisting works (other than the three registered designs) are being referenced. *See* 17 U.S.C. § 101 (defining "architectural work" as "the design of a building *as embodied in any tangible medium of expression*") (emphasis added). The statement certainly does not suggest that the three-dimensional models are themselves the preexisting works.

plaintiff cannot use an effective registration theory to sue on aspects of unregistered preexisting works that are not included in the work he did register.

But that is exactly what Oravec is attempting to do here by seeking damages for the construction of the Trump Buildings. As noted, a PGS copyright cannot be infringed by an as-built structure. Thus, even assuming Oravec has unregistered preexisting architectural works copyrights in the architectural designs embodied in the March 2004 Copyright, the right to prevent the construction of buildings mirroring those designs is an aspect of those preexisting architectural works copyrights that cannot be (and thus was not) incorporated into his March 2004 PGS Copyright. Thus, Oravec seeks to sue on an aspect of an unregistered underlying work that is not incorporated into the derivative work he did register. The effective registration doctrine cannot be stretched that far.

Accordingly, we hold that Oravec's March 2004 Copyright does not entitle him to claim architectural work protection for his registered PGS works. We affirm the grant of summary judgment as to the March 2004 Copyright.

### D. Motion to Amend Complaint

Finally, Oravec argues that the district court erred in denying him leave to amend his complaint to correct the jurisdictional defect arising from the PGS copyright registration. He contends that the court should have granted his motion

because there was no undue delay and because the exclusion of the March 2004 claims results in injustice. Alternatively, Oravec argues that amendment of the complaint was unnecessary because his registration of the materials as architectural works in July 2006 cured any jurisdictional defect.

We "will only reverse a district court's denial of a motion to amend in instances in which the district court has clearly abused its discretion." *Henson v. Columbus Bank & Trust Co.*, 770 F.2d 1566, 1574 (11th Cir. 1985). Oravec's argument on appeal focuses primarily on establishing that leave to amend was warranted under Fed. R. Civ. P. 15(a). However, because Oravec filed his motion after the scheduling order's deadline for such motions, he "must show good cause why leave to amend the complaint should be granted." *Smith v. Sch. Bd. of Orange County*, 487 F.3d 1361, 1366 (11th Cir. 2007) (per curiam), *petition for cert. filed*, (U.S. Oct. 22, 2007) (No. 07-1228); *see also* Fed. R. Civ. P. 16(b); *Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000) (finding no abuse of discretion in district court's denial of leave to amend on grounds of undue delay where movant failed to show good cause for delay); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the

Federal Rules of Civil Procedure.").

We have recognized that Rule 16(a)'s good cause standard "precludes modification [of the scheduling order] unless the schedule cannot be met despite the diligence of the party seeking the extension." *See Sosa*, 133 F.3d at 1418 (internal quotation marks omitted); *see also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) ("If [a] party was not diligent, the [good cause] inquiry should end."). Here, Oravec did not show the requisite level of diligence in pursuing his claims. He filed his motion to amend on July 12, 2006, over twenty months after filing the original complaint, more than a year after the expiration of the deadline for amending the pleadings, and only six weeks before trial. Oravec argues that he lacked notice of the jurisdictional concern regarding his PGS copyrights until the district court indicated on July 7 that those claims could not be maintained. However, the fact that Oravec or his counsel misunderstood the scope of legal protection available for PGS works does not constitute good cause. In any event, Oravec was aware of the defendants' challenge to his March 2004 Copyright claim since at least April 2006, when the defendants filed their motion for summary judgment. He nonetheless waited an additional three months to file additional copyright registrations and to seek leave to amend. Under these circumstances, the district court acted within its discretion

29

in denying his motion.

Oravec's alternative argument that his registration of the March 2004 materials as architectural works eliminated the need to amend his complaint likewise is without merit. Oravec relies on *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357 (5th Cir. 2004), in which the plaintiff filed an infringement action before the Copyright Office had received the plaintiff's copyright registration materials. The court held that this jurisdictional defect was cured when the materials were received, even though the plaintiff did not file a supplemental complaint. *Id.* at 366-67. *Positive Black Talk* is inapposite, however, because in that case the plaintiff's complaint related to the same copyright claim that was registered with the Copyright Office. Here, Oravec's existing complaint alleged infringement of his March 2004 PGS copyright, but not his July 2006 architectural work copyrights. To allege infringement of the latter, Oravec was required to amend his complaint.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**

A True Copy - Attested

Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____

Deputy Clerk
Atlanta, Georgia

30

## APPENDIX A



ORV-005746

# APPENDIX B



**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**
**BILL OF COSTS**

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

MAY 2 3 2008

THOMAS K. KAHN
CLERK

PAUL ORAVEC,
_____ Appellant
_____

vs.                                                    Appeal No. 06-14495

SUNNY ISLES LUXURY VENTURES, LC., et al.
_____ Appellee

Fed.R.App.P. 39 and 11th Cir. R. 39-1 (see reverse) govern costs which are taxable in this court and the time for filing the Bill of Costs.  A motion for leave to file out of time is required for a Bill of Costs not timely received.

**INSTRUCTIONS**

In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced.  Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| DOCUMENT | Repro. Method (Mark One) | | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| | In-House | Comm* | | | | | |
| Appellant's Brief | | | | | | | |
| Record Excerpts | | | | | | | |
| Appellee's Brief | X | | 76 | 12 **(11)** | 912 | 136.80 | **$125.40** |
| Reply Brief | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | **TOTAL** | | $    136.80 | $**$125.40** |
| | | | | | | REQUESTED | ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred or performed in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Date Signed:  5-22-08 _____        Signature: _Susan Raffanello_

Attorney for:  SIEGER SUAREZ ARCHITECTURAL        Attorney Name: SUSAN E. RAFFANELLO
    (Type or print name of client) PARTNERSHIP, INC.          (Type or print your name)

A True Copy - Attested
Clerk U.S. Court of Appeals
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

**FOR COURT USE ONLY**

Costs are hereby taxed in the amount of $  **$125.40** _____  against   **Appellant**

and are payable directly to _____  **Appellee**

Thomas K. Kahn, Clerk

JUN 1 2 2008

Issued on: _____          By: _Irene A. Patterson_
                                             Deputy Clerk

MISC-12
(12/07)

FRAP 39. Costs

(a)   Against Whom Assessed. The following rules apply unless the law provides or the court orders otherwise:

    (1)   if an appeal is dismissed, costs are taxed against the appellant, unless the parties agree otherwise;

    (2)   if a judgment is affirmed, costs are taxed against the appellant;

    (3)   if a judgment is reversed, costs are taxed against the appellee;

    (4)   if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed only as the court orders.

(b)   Costs For and Against the United States. Costs for or against the United States, its agency, or officer will be assessed under Rule 39(a) only if authorized by law.

(c)   Costs of Copies. Each court of appeals must, by local rule, fix the maximum rate for taxing the cost of producing necessary copies of a brief or appendix, or copies of records authorized by Rule 30(f). The rate must not exceed that generally charged for such work in the area where the clerk's office is located and should encourage economical methods of copying.

(d)   Bill of Costs: Objections; Insertion in Mandate.

    (1)   A party who wants costs taxed must — within 14 days after entry of judgment — file with the circuit clerk, with proof of service, an itemized and verified bill of costs.

    (2)   Objections must be filed within 10 days after service of the bill of costs, unless the court extends the time.

    (3)   The clerk must prepare and certify an itemized statement of costs for insertion in the mandate, but issuance of the mandate must not be delayed for taxing costs. If the mandate issues before costs are finally determined, the district clerk must — upon the circuit clerk's request — add the statement of costs, or any amendment of it, to the mandate.

(e)   Costs on Appeal Taxable in the District Court. The following costs on appeal are taxable in the district court for the benefit of the party entitled to costs under this rule:

    (1)   the preparation and transmission of the record;

    (2)   the reporter's transcript, if needed to determine the appeal;

    (3)   premiums paid for a supersedeas bond or other bond to preserve rights pending appeal; and

    (4)   the fee for filing the notice of appeal.

\* \* \* \*

11th Cir. R. 39-1 Costs. In taxing costs for printing or reproduction and binding pursuant to FRAP 39(c) the clerk shall tax such costs at rates not higher than those determined by the clerk from time to time by reference to the rates generally charged for the most economical methods of printing or reproduction and binding in the principal cities of the circuit, or at actual cost, whichever is less.

Unless advance approval for additional copies is secured from the clerk, costs will be taxed only for the number of copies of a brief and record excerpts or appendix required by the rules to be filed and served, plus two copies for each party signing the brief.

All costs shall be paid and mailed directly to the party to whom costs have been awarded. Costs should not be mailed to the clerk of the court.

\* \* \* \*

I.O.P. -

    1.   Time - Extensions. A bill of costs is timely if filed within 14 days of entry of judgment. Judgment is entered on the opinion filing date. The filing of a petition for rehearing or petition for rehearing en banc does not extend the time for filing a bill of costs. A motion to extend the time to file a bill of costs may be considered by the clerk.

    2.   Costs For and Against the United States. When costs are sought for or against the United States, the statutory or other authority relied upon for such an award must be set forth as an attachment to the Bill of Costs.

    3.   Reproduction of Statutes, Rules, and Regulations. Costs will be taxed for the reproduction of statutes, rules, and regulations in conformity with FRAP 28(f). Costs will not be taxed for the reproduction of papers not required or allowed or papers pursuant to FRAP 28 and 30 and the corresponding circuit rules, even though the brief, appendix, or record excerpts within which said papers are included was accepted for filing by the clerk.